# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **CRIMINAL NO.  05-440-22** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **THAIS Y. THOMPSON** | **:** | |

## GOVERNMENT'S RESPONSE TO THAIS Y. THOMPSON'S MOTION IN LIMINE

      The United States of America, by Patrick L. Meehan, United States Attorney for the Eastern District of Pennsylvania, and Richard A. Lloret and Michael J. Bresnick, Assistant United States Attorneys, respectfully submits the Government's Response To Defendant, Thais Y. Thompson's, Motion in Limine.

## I.     BACKGROUND

      On March 22, 2006, a federal grand jury returned a 175-count Fourth Superseding Indictment against defendants Alton Coles, James Morris, and others for, among other things, multiple narcotics distribution, firearms, and financial crimes.

      On June 7, 2006, defendant Thais Thompson testified in the federal grand jury about a number of subjects.  She lied throughout her testimony, including about the $559,000 in cash that had been recovered from her home, saying under oath that it had been left to her by her dead grandfather, who had been a boilermaker.  She also denied making a $25,000 payment to anybody.  In fact, Coles's prior attorney, Dennis Cogan, and his secretary, gave statements to ATF agents that defendant Thompson had previously given Cogan $25,000 in cash to help pay Alton Coles's attorney fees.  In addition, Coles' former attorney filed a Form 8300 with the IRS, pursuant to IRS regulations, declaring that he had, in fact, received a payment of $25,000 in cash

from Thompson.  Last, the attorney's secretary made a photocopy of Thompson's driver's license when Thompson gave the cash.

During her grand jury testimony, Thompson also denied knowledge of any bank accounts of James Morris.  On April 17, 2006, however (almost three months before her grand jury testimony), Morris, who was detained at the FDC, called Thompson.  She asked Morris if his account number to the credit union was at his grandmother's house.  Morris told her she did not need the account number because all she was doing was depositing a check into his account; she was not taking money out.  On April 18, Morris asked Thompson if she deposited the check. Thompson responded, "That's what I'm going to Delaware to do."  The records of the Delaware Federal Credit Union reveal that Morris has had an account there since December 2, 2002, and that someone deposited a check into Morris's account on April 27, 2006, in the amount of $2,783.69.  A surveillance photograph of the teller's station at the bank on April 27 shows two women at the station, one of whom is Thompson.

On February 21, 2007, a federal grand jury returned a 194-count Fifth Superseding Indictment against defendants Coles, Morris, and others, charging all crimes included in the Fourth Superseding Indictment, as well as new crimes committed by all previously-charged defendants, as well as by three new defendants.  One of these three new defendants was Thais Thompson, who was charged with lying under oath before the federal grand jury (Counts 189, 190, and 191), in violation of 18 U.S.C. § 1623(a), and for acting as an accessory after the fact to the drug conspiracy, in violation of 18 U.S.C. § 3 (Count 192). This latter charge is the result of her knowing that Morris had conspired to distribute more than 50 grams of crack and more than 5 kilograms of cocaine (as alleged in Count 1), and Thompson's

subsequent perjury in the federal grand jury to assist defendant Morris by preventing his trial and punishment, in violation of 18 U.S.C. § 3.  Thompson also is charged in Count 67 with co-defendant Morris with jointly possessing the firearm found in the kitchen of their house in furtherance of a drug trafficking crime, to wit, (i) the conspiracy charged in Count 1 of the Fifth Superseding Indictment, and (ii) maintaining a house for the purpose of storing and distributing cocaine, in violation of 21 U.S.C. § 856.

        The government provided Thompson in advance of trial with selections of her grand jury testimony that it intends to read at trial.  These thirteen selections are attached hereto under Tab numbers 170 through 182 (which have been added to the end of Book II, in which the government previously had included transcripts of Title-III telephone calls of Alton Coles.  In culling these selections, the government carefully avoided including any reference to Thompson's assertion of the Fifth Amendment during her testimony, or any reference to her co-defendant James Morris that might directly implicate him, pursuant to <u>Bruton</u>.  I include summaries of the 13 different selection below:

Selection 1 (Tab 170)-- Grand Jury transcript, page 2, line 9, to page 10, line 8

        This selection includes the advice of rights and basic background information about the defendant, including where she lives and has lived, as well as who paid for the house at 5 North Burden Hill Road, in Salem County, New Jersey.

Selection 2 (Tab 171)–Grand Jury transcript, page 31, line 5, to page 39, line 10

        Here, Thompson discusses the $559,396 in cash that was recovered from her house on August 10, 2005.  She testified that it had belonged to her grandfather, John Fletcher, who died on February 24, 2004.  Thompson further testified that prior to his dying he instructed her to use

that money to take care of her grandmother after he died.  She explained that the money was left in a cardboard box in his attic and she retrieved it a couple of months after his death.

Selection 3 (Tab 172)–Grand Jury transcript, page 39, line 20, to page 41, line 25

Thompson testified that she kept the cash in different locations throughout the house because her grandfather never trusted banks, even though she maintained a bank account for her own money.

Selection 4 (Tab 173)–Grand Jury transcript, page 41, line 6, to page 54, line 10

Thompson testified here that she bought a money counter in order to count the cash her grandfather left her, counted it by herself, and left the money counter on the side of the couch.  She also testified that she owned a firearm–a 9mm Smith and Wesson–and stated that she needed it for "protection."  She kept the gun loaded.  She also was asked if she kept any other caliber ammunition in the house.  Thompson testified, "I don't know.  Probably."  She explained that her grandfather used to own guns and, when she moved his boxes to her house, likely moved some of his ammunition.  She also testified that she kept an additional 113 loose rounds of ammunition in the house because she needed them for "practice," although no one ever accompanied her when she practiced shooting in her backyard, where she shot at cans. Additionally, she testified that she did not remember buying a digital scale.  Last, she answered a number of questions about James Morris, including whether he owned any bank accounts.  She denied knowing anything about it.

Selection 5 (Tab 174)–Grand Jury transcript, page 79, line 5, to page 83, line 6

Thompson answered more questions about the money her grandfather allegedly left to her after his death.  She also testified that her grandfather had been a boilermaker.

4

Selection 6 (Tab 175)–Grand Jury transcript, page 84, line 9, to page 84, line 23

She testified that she has not paid for anybody's lawyer, nor has anyone asked her to do so.

Selection 7 (Tab 176)–Grand Jury transcript, page 96, line 6, to page 100, line 24

Thompson testified some more about whether she paid for anybody's lawyer, including whether she ever paid $25,000 in cash to anybody in her entire life.  She denied doing so.

Selection 8 (Tab 177)–Grand Jury transcript, page 103, line 11, to page 104, line 6

Thompson testified that the money she had placed the money she received from her deceased grandfather in various locations throughout the house because she likes to "remove things and put part here and part there."

Selection 9 (Tab 178)–Grand Jury transcript, page 106, lines 2 through 11)

Thompson had an opportunity to speak to her lawyer.

Selection 10 (Tab 179)–Grand Jury transcript, page 107, line 1, to page 109, line 23

She testified that the cash she retrieved from her grandfather had been "rubberbanded" and in bags.

Selection 11 (Tab 180)–Grand Jury transcript, page 116, line 23,to page 129, line 17

Thompson was asked about the kilogram wrappers found in her house.  She repeatedly stated, "I know nothing about any kilogram wrappers."  When asked, "Were they yours?" Thompson would not answer the question; instead, she would only say that she was not aware of any kilogram wrappers.  This back and forth continued for some time.  Also, she reiterated that the money counter had been on the side of the living room couch.  She also denied

owning a digital scale, and stated that she was not aware that any .40 caliber ammunition had

been in the drawer of her dining room table.  Moreover, she testified that she never reported any

of the cash she received from her grandfather to the IRS.

Selection 12 (Tab 181)–Grand Jury transcript, page 130, lines 1 through 14

Thompson testified that the cash lying around her house belonged to her or her

family.

Selection 13 (Tab 182)–Grand Jury transcript, page 130, line 18, to page 131, page 9

She testified that she had no intentions of buying a car lot with the money found

in her house.

Defendant Thompson now moves the Court, *in limine*, (1) to have the government

read in additional selections of her grand jury testimony, under the Rule of Completeness, (2) to

exclude portions of the transcript under the rule of Bruton, and (3) to exclude portions of the

transcript under Rule 403.  I address these in turn.

The Rule of Completeness

The common law principle raised by the defendant has been codified in Rule 106

of the Federal Rules of Evidence.  Rule 106 provides that "[w]hen a writing or recorded

statement or part thereof is introduced by a party, an adverse party may require the introduction

at that time of any other part or any other writing or recorded statement which ought in fairness

to be considered contemporaneously with it."  Pursuant to Rule 106, a second writing may be

required to be read if it is necessary to (1) explain the admitted portion, (2) place the admitted

portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair and impartial

understanding.  See United States v. Soures, 736 F.2d 87, 91 (3d Cir. 1984).  "The completeness

doctrine does not, however, require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages." United States v. Jackson, 180 F.3d 55, 73 (2d Cir. 1999). See also Pereira v. Superintendent, Wyoming Correctional Facility, 2005 WL 2038618, at *4 (E. D. N. Y. Aug. 22, 2005) (""Rule 106 does not require that the entire statement be admitted solely because a portion of it is."). Indeed, courts should be vigilant against allowing defendants to covert Rule 106 "into a simple expedient for circumventing the careful balancing of interests codified in Rule 804(b)(3)." United States v. Green, 694 F. Supp. 107, 110 (E.D. Pa. 1988).

Defense Requests

        The defendant here seeks to admit pages 15 through 21 of her grand jury testimony, under the theory that this additional testimony puts her other statements in context. As the Court can see from the attached transcript, these pages concern her co-defendant James Morris and various issues regarding any girlfriends he might have had in addition to Thompson, where Morris resides, children Morris has, and where Morris had been on August 10, 2005. It was Thompson's testimony that Morris arrived at 5 North Burden Hill Road just three hours or so before it was searched by federal agents.

        Because the defendant fails to demonstrate that these other portions of her grand jury testimony meets the standards for admission under Rule 106, her objection should be denied. None of the other portions of her grand jury testimony are either explanatory or relevant to portions offered by the government. The Third Circuit's decision in Soures is on point. In that case, the defendant argued that the district court had violated Rule 106 when it admitted only one of two days of the defendant's prior grand jury testimony. The court disagreed, holding that the

district court did not err in finding that "there was no need to read the second day's grand jury testimony in order to place the first day's testimony in a fair light."  The same result should apply here.

Thompson's effort to consider these additional portions of her testimony is off-base.  She claims that since the government did not show her during her grand jury testimony any pictures of the actual bags of cash taken from her house, it would be "misleading to assume that the bags that were never shown to Ms. Thompson were all the bags that were subject to the grand jury testimony . . . ."  Def. Br. at 5-6.  Thompson, however, had no trouble understanding the questions about the cash when asked in the grand jury:

Page 31, line 5 (Tab 171)

Q:      All right.  Ma'am, also on August 10, 2005, are you aware that agents recovered $559,296 in cash from your house?

A:      Yes.

Q:      You are aware of that?

A:      Yes.

Q:      When did you become aware of that?

A:      Well, the actual amount, they never gave me a money receipt for.  I did know that they recovered cash from my home, yes.

Q:      Was that your money?

A:      Yes.

Q;      All $559,000 in cash?

A:      Belonging to my family.

Q:      Who gave you that money?

A:      A lot of it was recovered when my grandfather died.

It is clear from these questions and answers that Thompson had no difficulty in discerning the cash that was the subject of her testimony. Additional selections from her grand jury testimony also make this plain, including her testimony that she placed the cash in five different locations throughout the house. Mr. Morris's whereabouts in the early morning hours of August 10, 2005, does not shed additional light on this testimony, and need not be read to put anything in context.

In addition, Thompson would like to read to the jury from page 24, line15, to page 26, line 2, and page 28, lines 18 to 20. She claims that these additional portions of her grand jury testimony are necessary to put in context her testimony regarding the different locations in her house that she placed her deceased grandfather's cash (see Selection 3, Tab 172, above).[1] The portions the defendant would like to have read, however, do not relate in the slightest way to the testimony she claims needs to be put in context. She claims that the government's mistaken questions to her about the half kilogram of cocaine found in her house–as opposed to the car outside–in effect, poisoned her mind against the prosecutors questioning her because they mistakenly referred to the incorrect location where the cocaine was found. This claim is

---

[1] The defendant mistakenly refers to this as government Clip No. 2. In fact, it is selection–or clip–number 3, Tab 172.

nonsense.  A witness before the grand jury has a complete obligation to tell the truth at every instance, even if she does not like the people questioning her.  This request should be denied.

The defendant further requests to put Selection 5, Tab 174, in context.[2]  Here, the defendant testified that her grandfather had been a boilermaker.  She requests to read a selection regarding his employment, claiming that the government ended the clip in the middle of her answer.  She includes a portion that she would like the government to play, at pages 82, line 17, to page 83, line 4.  Since the government already included this selection in the portion of the transcript it intends to read, the defendant's request here should be denied as moot.

The defendant further requests to read page 112, line 3, to line 23, regarding her grandfather and the cash.  The government does not object to reading this selection of her testimony.

Thompson also asks to have read to the jury Mr. Lloret's statement on page 100, line 25 (to be added to the end of government selection 7, Tab 176), where he states that he has no additional questions at this time.  This statement has no relevance to any of the defendant's testimony and is not necessary to put anything in context.  The Court should deny this request.

The defendant complains about Selection 9, Tab 178,[3] where she testifies that she had an opportunity to speak to a lawyer.  She claims that it is irrelevant and unduly prejudicial under Rule 403.  To the contrary, it is relevant to showing that Thompson was not coerced into

---

[2]  The defendant mistakenly refers to this as clip number 3.  In fact, it is government selection–or clip–number 5, Tab 174.

[3]  The defendant mistakenly refers to this as clip number 5.  In fact, it is government selection–or clip–number 9, Tab 178.

testifying before the grand jury, that she had a lawyer present with her, that she had an

opportunity to speak to him, and that, nevertheless, she still lied to the grand jury.  The

government carefully excised any reference to Thompson's assertion of the Fifth Amendment.

She claims that it could, however, leave the impression that her lawyer "shaped" her testimony.

Again, this claim is nonsensical.  Any witness before the grand jury has an absolute right to be

represented by a lawyer.  She was advised of this right at the beginning of her testimony, and

took an opportunity to consult with her lawyer during her subsequent testimony.  This shows that

Thompson was aware of her rights, took advantage of them, and still continued to lie.  It is highly

relevant and should be included in the government's presentation.

   The defendant also complains about Selection 11, Tab 180[4].  Specifically, she

argues that any reference by the prosecutor to "kilo wrappers" (page 118, line 8, to page 121, line

12) would be inadmissible as a misstatement of fact.  The defendant is wrong.  The prosecutor is

free to characterize the evidence as he sees it.  In this case, the prosecutor repeatedly asked

Thompson about kilo-wrappers taken from her house.  She repeatedly testified that she was not

aware of any kilo wrappers, and that she did not know anything about it.  What is most telling

about this testimony, however, is Thompson's absolute refusal to answer these questions as they

were put to her.  It is obvious that she was trying her best to protect James Morris by her

answers, a critical element in the charge against her as acting as an accessory after the fact.

Rather than simply answering "no," when asked if they were hers, she kept repeating that she

was not aware of any kilo wrappers and that they were not on her "list," which, as the trial has

---

 [4]  The defendant mistakenly refers to this as clip number 6.  In fact, it is government selection–or clip–number 11, Tab 180.

shown, was the search warrant return summary of items seized.  This testimony is relevant and highly probative of her state of mind, and should be admitted.

Starting at Selection 11, Tab 180, page 126, line 6,[5] the prosecutor asked Thompson if she reported the cash she received from her grandfather to the IRS.  She said she had not.  Thompson now asks to exclude this testimony as 404(b) evidence.  To the contrary, it is relevant to proving that her testimony about the source of the cash was a lie.  If she had, in fact, come across this money honestly, she likely would have brought it to the attention of an accountant to determine if, in fact, she was required to pay taxes on the money.  Her testimony was that she had not gotten around to it, even though she had been in possession of the cash for over one and a half years, and even though she had used an accountant for her own tax filings in the past (see Tab 180, page 127, line 21, to page 129, line 17).  This testimony is not being offered to prove that she committed tax evasion or failed to file tax returns, under 26 U.S.C. §§ 7201, 7203.  Rather, it is relevant to proving that she lied about the source of the cash.

She further complains about Selection 13, Tab 182,[6] where she testified that she was not planning to buy a car lot with the money she had in the house.  She claims–wrongly–that this is "clearly inadmissible" under Bruton.  First, as is clear, she does not have a Bruton claim with respect to her own statement.  That claim belongs to a co-defendant, if at all.  Her testimony is admissible as an admission by a party-opponent, under Rule 801(d)(2)(A).  Second, she offers no explanation for why this testimony would offer a Bruton problem for anyone.  Presumably,

[5]  The defendant mistakenly refers to this as clip number 6.  In fact, is government selection–or clip–11, Tab 180.

[6]  The defendant mistakenly refers to this as clip number 7.  In fact, is government selection–or clip–13, Tab 182.

she is referring to James Morris's statement to the agent who recovered the cash on August 10,

2005, that he was planning to buy a car lot with the cash. But, as the government explained in

previous filings, there is no <u>Bruton</u> problem when there is, at best, an indirect implication of a co-

defendant, and not a direct implication.

          <u>Bruton v. United States</u>, 391 U.S. 123 (1968), bars admission at a joint trial of a

co-defendant's statement that is "powerfully incriminating" to the defendant. <u>Id.</u> at 135- 36. In

that two-defendant case, the government introduced a co-defendant's confession, which stated

that both the declarant and Bruton committed a robbery together. The Supreme Court held that

admission of this express statement violated Bruton's Sixth Amendment right to cross-examine

witnesses because the statements were so powerfully incriminating that limiting instructions

would be ineffective.

          The Court re-visited this issue in <u>Richardson v. Marsh</u>, 481 U.S. 200 (1987).

There, the government redacted a co-defendant's confession to omit all reference to the

defendant. In the context of other trial evidence, however, the statement could have helped the

jury conclude that Marsh was a participant in the crime. The Supreme Court rejected Marsh's

challenge to the introduction of this statement and refused to extend <u>Bruton</u> to this situation.

Unlike the confession in <u>Bruton</u>, which "expressly implicat[ed]" the defendant, the statement in

<u>Richardson</u> "was not incriminating on its face, and became so only when linked" with other

evidence. <u>Id.</u> at 208. The Court held that <u>Bruton</u> only prohibits the use of statements that

"clearly inculpate" the defendant or are "powerfully incriminating" on their face. <u>Id.</u> at 207.

In other words, to invoke <u>Bruton</u>, the statement in question must directly, rather than indirectly,

implicate the complaining defendant. If the co-defendant's out-of-court statement does not

clearly and directly implicate the defendant, then "the <u>Bruton</u> rule does not come into play." <u>United States v. Belle</u>, 593 F.2d 487, 493 (3d Cir. 1979) (en banc).

Thompson's motion (presumably on Morris's behalf) fails to prove that her testimony about the car lot was powerfully incriminating on its face as to Morris. For this reason, it should be denied.

Defendant's requests to include pages 23 through 31 do not put any of her testimony in context, and should be excluded. This testimony concerns, once again, the prosecutors' questioning the defendant about half a kilogram found "in her house," as opposed to in the car. This questioning was a mistake, and was later corrected. If Thompson would like to explain to the jury in this case that she was "poisoned" against the prosecutor as a result of this question, and found herself unable to answer additional questions truthfully, she will have every opportunity to testify in her own defense in this case.

Thompson claims that portions from Selection 4, Tab 173,[7] must be excluded because she was not charged with perjury regarding the money counter that was in the house (<u>see</u> page 42, line 6, to page 45, line 14). This testimony, however, is directly related to her testimony that she received a large sum of cash from her deceased grandfather, since she testified that she bought the money counter after she retrieved the cash from his attic. She also claims that her grand jury testimony about the additional rounds of ammunition in the house would give the jury here the wrong impression that she gave unregistered guns to someone else (<u>see</u> page 47, line 5, to page 52, line 7) and should be excluded under Rule 403. These selections from her testimony,

---

[7] The defendant mistakenly refers to this as clip number 9. In fact, it is government selection 4, Tab 173.

however, help prove that she was lying to the grand jurors in an effort to protect James Morris. Since she is charged as an accessory after the fact to the conspiracy in which Morris is charged, and that charge is based on her grand jury testimony, these selections should be admitted. In addition, both Thompson and Morris are charged in Count 67 with jointly possessing the Smith and Wesson that was found in Thompson's purse in furtherance of the drug trafficking conspiracy with which Morris was charged, and in furtherance of their managing a stash house at 5 North Burden Hill Road. Her lies about the guns and ammunition are relevant to that crime as well.

In Selection 6, Tab 175,[8] Thompson was asked if she had ever paid for anybody else's lawyer. She testified that she had not. Next, she was asked if she knew Alton Coles. She testified that she knew him as "Ace." The evidence at trial will be that Thompson paid $25,000 in cash to the lawyer of Alton Coles on his behalf. Thompson now asks the Court to include other portions of the transcript, including pages 87 and 88, where Thompson testified that she had never met Ace, that Ace was friends with Morris, and that Ace and Morris bred pitbulls together. This selection requested by the defendant is irrelevant to the testimony the government would like to have read to the jury. Selection 6, Tab 175, must be read in conjunction with Tab 176, Selection 7, where Thompson testifies that she never made a payment of $25,000 in cash to anyone at any time in her life. The selection request by the defendant has no relevance to this issue, and is not needed to put anything in context.

---

[8] The defendant mistakenly refers to this as clip number 10. In fact, it is government selection–or clip–6, Tab 175.

In Selection 8, Tab 177,[9] Thompson testified that the money she had placed the money she received from her deceased grandfather in various locations throughout the house because she likes to "remove things and put part here and part there." She now argues that this is not relevant to the charge of perjury. This is incorrect. The jury can, upon hearing her testimony as to this issue, believe that she was lying about receiving the cash from her grandfather. It is directly relevant to the issue of the cash, which is one of the counts of perjury in the Fifth Superseding Indictment.

In Selection 10, Tab 179, Thompson testified that the cash she retrieved from her grandfather had been "rubberbanded" and in bags. She asserts: "Once again this must be put in proper context. The full context would be referenced if the Court is inclined to introduce this with Government Clip 11." Since the government cannot understand this request, it cannot address it herein, and respectfully reserves the right to address it in open court if necessary.

Last, the defendant complains about Selection 12, Tab 181, where she testified that the money in the house belonged to her and her family. She also testified that the money in the house did not belong to [Morris]. Thompson claims that this raises a <u>Bruton</u> issue. Again, this is wrong, even if she is asserting it on Morris's behalf. Not only does this statement not directly implicate Morris, it, by itself, exculpates him. Moreover, there is still no reason why it would be necessary for the jury to hear Thompson's testimony that Morris allegedly arrived at her house at 3 a.m. on August 10, 2005. That is entirely irrelevant.

For these reasons, the defendant's motion should be denied.

---

[9] The defendant mistakenly refers to this as clip 11. In fact, it is government selection–or clip–number 12, Tab 181.

Respectfully submitted,

PATRICK L. MEEHAN
*United States Attorney*


/s/ Michael J.  Bresnick_____
MICHAEL J. BRESNICK
RICHARD A.  LLORET
*Assistant United States Attorneys*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing Response by the United States was served on counsel, below, by email or by regular mail, on the date indicated below.

Christopher D. Warren

1500 Walnut Avenue

Suite 1500

Philadelphia, PA 19102

Ph: (215) 546-3750

Fax: (215) 546-8779

email: Christopherduffwarren@hotmail.com

       Counsel for Alton Coles (1)


Jack McMahon

1500 Walnut Street

Suite 900

Philadelphia, PA 19102

Fax: (215) 985-4416

Phone: (215) 985-4443

Email: mcmahonlaw.@hotmail.com

       Counsel for Timothy Baukman (8)


Paul J. Hetznecker, Esq.

Hetznecker & Meehan

1420 Walnut Street, Suite 911

Philadelphia, PA 19102

Phone: 215-893-9640

Fax: 215-893-0255

       Counsel for Thais Y. Thompson (22)


Ronald B. Thompson, Esq.

3002 Lincoln Drive, Suite J

Marlton, NJ 08053

Phone: (856) 797-5785

Fax: (856) 797-5786

Fax: (856) 597-4200

Email: ronaldbthompson@lawyer.com

       Co-Counsel for James Morris (13)

18

Wayne Powell, Esq.

811 Church Road

101 Tarragon Building

Cherry Hill, NJ 08002

Phone: (856) 488-0004

Fax: (856) 486-7244

      Co-Counsel for James Morris (13)

Laurence Harmelin
P.O. Box 3574
West Chester, Pa 19381
Tel. & Fax:  610-429-1330
      Counsel for Monique Pullins (12)

 

/s/ Michael J. Bresnick
MICHAEL J. BRESNICK
ASSISTANT U.S. ATTORNEY