IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 05-440–8 |
| TIMOTHY BAUKMAN | : | |

**SURRICK, J.**                                                            **AUGUST 31, 2010**

<u>**MEMORANDUM**</u>

Presently before the Court is Defendant Timothy Baukman's Motion for Judgment of

Acquittal. (Doc. No. 767.) For the following reasons, Defendant's Motion will be denied.

**I.      BACKGROUND**

On February 21, 2007, the grand jury returned a 194-count Fifth Superseding Indictment

(the "Indictment") against Alton Coles and twenty-one co-defendants, including Timothy

Baukman. (Doc. No. 295.) Count 1 of the Indictment charged nineteen individuals, including

Baukman, with conspiracy to distribute at least 1200 kilograms of cocaine and 600 kilograms of

cocaine base ("crack") in violation of 21 U.S.C. § 846. Count 2 charged Coles and Baukman with

engaging in a continuing criminal enterprise ("CCE"), that is, managing the conspiracy and

committing criminal activity in violation of 21 U.S.C. § 848. The Indictment also charged

Baukman with managing and controlling a storage facility for the purpose of unlawfully storing

and distributing a controlled substance in violation of 21 U.S.C. § 856(a)(2) (Count 61); possession

with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A) (Count 62);

possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C.

§ 924(c)(1) (Counts 63, 68, 183); money laundering to promote drug trafficking in violation of 18

U.S.C. § 1956(a)(1)(A)(i) (Counts 89–120); money laundering to conceal the nature, source, ownership, and control of funds in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Counts 121–175); using and carrying a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1) (Count 184); and knowing possession of an unregistered firearm in violation of 26 U.S.C. § 5861(d) (Count 187).

The first six co-conspirators including Baukman went to trial in January of 2008. On March 4, 2008, after almost eight weeks of testimony and almost one week of jury deliberations, the jury returned a verdict of guilty against Baukman on Counts 1, 2, 61, 62, 63, 68, and 89–175. (Doc. No. 745.) Baukman was found not guilty on Count 187. (*Id.*) Counts 183 and 184 were not submitted to the jury and will be dismissed at sentencing.

## II.     LEGAL STANDARD

Federal Rule of Criminal Procedure 29(a) provides that "[a]fter the government closes its evidence or after the close of all evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." The court may reserve decision on the motion under Rule 29(b). "If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 26(b); *see also United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (stating that when a court reserves ruling on a Rule 29(a) motion it must "determine whether an acquittal was appropriate based solely on the evidence presented by the government").

"When sufficiency of the evidence at trial is challenged, the Court must affirm if a rational trier of fact could have found the defendant guilty beyond a reasonable doubt and if the verdict is supported by substantial evidence." *United States v. Bobb*, 471 F.3d 491, 494 (3d Cir. 2006)

(citing *United States v. Coyle*, 63 F.3d 1239, 1243 (3d Cir. 1995)); *see also United States v. Smith*, 294 F.3d 473, 478 (3d Cir. 2002) (finding that courts should "sustain the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"). Moreover, in considering a Rule 29 motion, the court "must view the evidence in the light most favorable to the government . . . ." *Smith*, 294 F.3d at 478 (citing *United States v. Dent*, 149 F.3d 180, 188 (3d Cir. 1998); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The court "must be ever vigilant in the context of Fed. R. Crim. P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). "A finding of insufficiency should be 'confined to cases where the prosecution's failure is clear.'" *Id.* (quoting *Smith*, 294 F.3d at 477).

## III.    LEGAL ANALYSIS

At the close of the Government's case, Baukman moved for judgment of acquittal under Rule 29(a) on the charges of conspiracy to distribute cocaine, CCE, possession of a firearm in furtherance of a drug trafficking crime, and knowing possession of an unregistered firearm, respectively Counts 1, 2, 63, and 187. (*See* Hr'g Tr. 5–10, Feb. 11, 2008.) We reserved ruling on Baukman's motion.[1] (*See id.* at 14, 37.) After the jury returned its verdict, Baukman renewed his motion under Rule 29(c) with regard to the CCE charge (Count 2) and also moved for a judgment

---

[1] Since the jury returned a verdict of not guilty on Count 187, Baukman's Rule 29(a) motion is moot with regard to that count. *See, e.g.*, *United States v. Atl. States Cast Iron Pipe Co.*, No. 03–852, 2007 U.S. Dist. LEXIS 56562, at *248, 264 (D.N.J. Aug. 2, 2007) (holding that Rule 29 motion filed at trial was rendered moot by jury's verdict of not guilty); *United States v. Potter*, No. 03–081, 2005 U.S. Dist. LEXIS 21451, at *3–4 (D.R.I. Sept. 27, 2005) (holding that the "[d]efendants' motions for judgment of acquittal [were] moot with respect to those counts on which the jury returned a verdict of not guilty").

of acquittal on the money laundering charges (Counts 89–175). (*See* Doc. No. 767 at 1.) The Government opposed the motion that Baukman made at the close of its case-in-chief, and it now opposes his renewed and additional motion for judgment of acquittal. (Hr'g Tr. 11–14, Feb. 11, 2008; Doc. No. 1133.)

### A.      Continuing Criminal Enterprise (Count 2)

Before beginning our CCE analysis, we note that the Government presented overwhelming evidence of a wide ranging multi-state drug conspiracy. The jury heard weeks of testimony, amounting to thousands of transcript pages, listened to hundreds of wiretapped phone calls, and viewed hundreds of exhibits. While not all of the Government's evidence dealt directly with Baukman, a significant amount of it dealt with him indirectly by informing the jurors about the nature of the conspiracy and Baukman's coconspirators. For instance, the Government presented substantial evidence regarding Coles's sham record company, Take Down Records, which he used to launder his illegal drug proceeds. The jury heard that, at best, the company's operating costs canceled out its revenues and that it essentially owed its existence to infusions of drug money. (*See, e.g.*, Trial Tr. 28–32, Feb. 8, 2008, Vol. I.) Baukman was as integral a part of Take Down Records as he was of the drug conspiracy. Many of the co-conspirators were also involved in one way or another with Take Down Records. The jurors obviously had this and other similar evidence in mind when reaching their verdict. Our analysis of the CCE count will nevertheless focus on the specific evidence on which the jury could have reasonably relied.

In order to prove a defendant guilty of CCE in violation of 21 U.S.C. § 848, the Government must establish beyond a reasonable doubt that the defendant: (1) committed a felony violation of the federal narcotics law; (2) as part of a continuing series of violations; (3) in concert

4

with five or more persons; (4) for whom the defendant is an organizer or supervisor; and (5) from which he derives substantial income or resources. *United States v. Aguilar*, 849 F.2d 92, 97 (3d Cir. 1988) (citing *United States v. Fernandez*, 822 F.2d 382, 384 (3d Cir. 1987)). Baukman challenged the first four elements in the Rule 29 motion that he made at the close of the Government's case, while his renewed motion specifically targets the third and fourth elements. (Hr'g Tr. 8–10, Feb. 11, 2008; Doc. No. 767 ¶ 4.) Viewing the motions together, Baukman's argument is twofold. He first contends that the Government offered no evidence that he was involved in a series of violations or a drug conspiracy. He then contends that there was no evidence that he supervised five or more people in a drug conspiracy.

Under the first two elements of the CCE statute, the Government must prove that the defendant committed a felony violation of a provision of United States Code Title 21, Chapter 13, subchapter I or II (various drug offenses) and that the violation was part of a "continuing series" of violations. *See* 21 U.S.C. § 848(c)(2). To satisfy the "continuing series" requirement, the Government must establish three predicate offenses that are related to each other in some way. *United States v. Edmonds*, 80 F.3d 810, 814 (3d Cir. 1996). The jury found Baukman guilty of, among other things, (1) conspiracy to distribute at least 1200 kilograms of cocaine and 600 kilograms of crack cocaine in violation of 21 U.S.C. § 846 (Count 1); (2) managing and controlling a storage facility for the purpose of unlawfully storing and distributing a controlled substance in violation of 21 U.S.C. § 856(a)(2) (Count 61); and (3) possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A) (Count 62). All three violations are felonies.[2]

---

[2] A violation is a felony if it is punishable by imprisonment for more than one year. *See* 21 U.S.C. § 802(13); 18 U.S.C. § 3559(a); *see also Burgess v. United States*, 553 U.S. 124, 1577 (2008) ("[T]he term 'felony' is commonly defined to mean a crime punishable by imprisonment

Baukman's § 846 conspiracy conviction is a predicate offense under the CCE statute.[3]  *See United States v. Fernandez*, 822 F.2d 382, 385 (3d Cir. 1987) (holding that § 846 conspiracy may serve as predicate offense for CCE).  Baukman's § 841 and § 856 convictions are also predicate offenses under the CCE statute.  *See* 21 U.S.C. § 848(c)(1).  Moreover, the three crimes are related because Baukman committed them all in furtherance of the same ongoing drug conspiracy.  *See Edmonds*, 80 F.3d at 814.  Accordingly, the Government carried its burden of proof on the first and second elements of the CCE count.

The third and fourth elements of a CCE violation require the Government to establish that the defendant acted "in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management."  21 U.S.C. § 848(c)(2)(A).  Courts give the terms organizer, supervisory, and management "their

---

for more than one year.") (citations omitted).  Violations of § 841(a)(1), (b)(1)(A) and § 856 are punishable by imprisonment for more than one year.  21 U.S.C. § 841(b)(1)(A) (minimum sentence of 10 years); 21 U.S.C. § 856 (punishable by term of imprisonment of up to 20 years).  Section 846 provides that a person found guilty of conspiracy is subject to the same penalties as prescribed in the underlying offense, and since the conspiracy charged was for the distribution of 5 kilograms or more of cocaine, the minimum penalty for which is imprisonment for 10 years, Baukman's violation of § 846 is also a felony.

[3] Baukman's § 846 conviction is a lesser included offense of his CCE conviction, and accordingly it must be vacated.  *See Rutledge v. United States*, 517 U.S. 292, 307 (1996); *Fisher v. Miner*, 216 F. App'x 255, 257 n.3 (3d Cir. 2007) (non-precedential).  We will vacate the conviction at sentencing.  We note, however, that our decision to vacate the conviction has no effect on its status as a predicate offense under § 848 because "[a] lesser included § 846 conspiracy may serve as a predicate offense for a § 848 CCE conviction."  *United States v. Miller*, 116 F.3d 641, 678 (2d Cir. 1997) (citation omitted).  Thus, Baukman's § 846 conviction may serve as one of the "continuing series" of violations contemplated by § 848.  *See, e.g.*, *United States v. Jackson*, No. 97–2896, 2000 U.S. Dist. LEXIS 1297, at *17–18 (E.D. Pa. Feb. 14, 2000) (observing that "[t]he Supreme Court's decision in *Rutledge* did not . . . address whether a lesser included § 846 conspiracy charge may serve as a predicate offense for a § 848 CCE charge" but that "several courts have held that a conspiracy may serve as a predicate offense for a CCE") (collecting cases).

nontechnical, everyday meanings." *United States v. Almaraz*, 306 F.3d 1031, 1040 (10th Cir. 2002) (internal quotation marks omitted). A defendant "need not have been the single ringleader of a drug enterprise" to be considered an organizer, supervisor, or manager. *United States v. Bass*, 310 F.3d 321, 326 (5th Cir. 2002). And the CCE statute does not require that a defendant have the same relationship with all five (or more) people; rather, the defendant may organize some, manage others, and supervise yet others, so long as there are five or more people subject to his authority. *See United States v. Bafia*, 949 F.2d 1465, 1472 (7th Cir. 1991) (quoting *United States v. Moya-Gomez*, 860 F.2d 706, 746 (7th Cir. 1988)). By the same token, since the statute uses disjunctive language, the Government need only prove that the defendant occupied one such position. *United States v. Lewis*, 759 F.2d 1316, 1331 (8th Cir. 1985) (citations omitted), *disapproved on other grounds*, *United States v. Newton*, 912 F.2d 212, 214 (8th Cir. 1990). The defendant also does not need to oversee or organize the five people at the same time. *United States v. Johnson*, 54 F.3d 1150, 1155 (4th Cir. 1995). Nor may the defendant "'insulate himself from CCE liability by carefully pyramiding authority so as to maintain fewer than five direct subordinates.'" *United States v. Hinojosa*, 958 F.2d 624, 630 (5th Cir. 1992) (quoting *United States v. Ricks*, 882 F.2d 885, 891 (4th Cir. 1989)). A defendant who "delegates authority to lieutenants and enforcers to do his managerial, supervisory, or organizational work . . . is nonetheless exercising control over the extended drug-ring participants who are doing his bidding." *Bass*, 310 F.3d at 327.

The Government offered more than sufficient evidence to sustain a conviction on the third and fourth elements of Baukman's CCE conviction. There is little doubt that Baukman was Coles's chief lieutenant and that he had significant organizational and managerial responsibilities

in the conspiracy. One witness described how Coles referred to Baukman as his "right-hand man." (Trial Tr. 90–91, Jan. 23, 2008, Vol. I.) A former member of the drug conspiracy, Charlton Custis, testified that on one occasion in March 2004, he came across Coles being arrested for carrying a firearm. His response was to call Baukman, so that Baukman could contact a criminal defense lawyer for Coles. (Trial Tr. 192–96, Jan. 28, 2008, Vol. I.) Custis testified that he "knew" to call Baukman when the police found the gun on Coles and that Baukman was "supposed" to call a predetermined attorney. (*Id.* at 195–97.) This episode highlights Baukman's high level of responsibility and authority in the drug conspiracy's hierarchy. It also demonstrates the conspiracy's organizational sophistication. Its members anticipated and planned for disruptions to its leadership.

The episode also corroborates the other evidence regarding the level of trust Coles reposed in Baukman. For example, Baukman ran a cocaine production and storage facility for Coles. (*See generally* Trial Tr., Jan. 17, 2008.) The jurors also heard how Baukman and Coles frequently handled cocaine together. (*See, e.g.*, Trial Tr. 21, Jan. 23, 2008, Vol. I; Trial Tr. 167–69, Jan. 24, 2008, Vol. I; *cf.* Trial Tr. 124–24, Jan. 31, 2008.) They saw Baukman's name in Coles's drug ledger. (Trial Tr. 136–39, Jan. 22, 2008; Gov't Ex. 502O–1.) And they heard how Baukman would deliver bags of money to Coles's residence, more money than Coles's other drug couriers would deliver. (Trial Tr. 59–62, 91, Jan. 23, 2008, Vol. I.) When law enforcement officials searched Baukman's home, they found $25,000 in cash, despite the fact that Baukman had no gainful employment. (*See* Trial Tr. 10, Feb. 4, 2008, Vol. II; Trial Tr. 165, Feb. 5, 2008; *see generally* Trial Tr. 35–50, Feb. 8, 2008, Vol. I; Gov't Exs. 704A, 704B.)

Baukman's argument that the Government "failed to present any evidence that [he] directed

anyone in a criminal organization" is meritless. (*See* Doc. No. 767 ¶ 4.) The Government proved that Baukman organized or supervised more than the five people necessary for a § 848 conviction. The evidence established the existence of a hierarchy with Coles at the top, Baukman as Coles's chief lieutenant, followed by Hakiem Johnson at the next level, Dante Tucker after that, Custis and an individual called Bub below Tucker, and Troy Wilson, Leroy Perkins, Barry White, Alfonso Kearny, and individuals named Ezz and Seneca working as "young boys" who sold drugs on street corners.[4] The evidence further established that at one time or another Baukman organized or otherwise controlled many of these people, including: Hakiem Johnson, Dante Tucker, Charlton Custis, Bub, Ezz, Troy Wilson, Leroy Perkins, Barry White, Alfonso Kearny, and Seneca.

Hakiem Johnson (a/k/a "Uncle Hak") is Coles's uncle and was a key player in the conspiracy. He was responsible for managing drugs and money, much like Baukman. (*See, e.g.*, Trial Tr. 51, 82–83, 115, Jan. 28, 2008, Vol. I.) Also like Baukman, Johnson delivered bags of money to Coles's house and cocaine to the street-level pushers, who in turn had their young boys sell it on the corners. (*See* Trial Tr. 20–21, Jan. 23, 2008, Vol. I.) At one point, Johnson was supplying Custis with about an ounce of crack cocaine per week. (Trial Tr. 121, Jan. 28, 2008, Vol. I.) At least one of Johnson's deliveries was done at Baukman's behest. Custis testified that he had obtained drugs from Baukman and sold them very quickly. (*Id.* at 191.) He called Baukman to obtain four more ounces of cocaine; Baukman "called Uncle Hak. And Uncle Hak

---

[4] The term "young boy" generally describes a young man or boy who sells drugs for and does the bidding of older, more experienced drug dealers. (*See* Trial Tr. 37–38, Jan. 28, 2008.) In the words of one coconspirator, a young boy is a person who is "running around on the streets selling the coke, selling the crack, doing whatever [he] need[s] to do for" his older male companion. (*Id.* at 38.) *See also United States v. Patterson*, 175 F. App'x 513, 516 (3d Cir. 2006) (non-precedential) (defining "young boy" as "a protege in the drug business").

called [Custis], got the money, and then later on he brought [Custis] some more work [i.e., cocaine]." (*Id.* at 192.) Given that Custis called Baukman to arrange the transaction and Johnson ended up doing the menial work—calling Custis, meeting him to pick up money, and then meeting him again to drop off the drugs—the jury could reasonably infer that, on at least this occasion, Johnson was either organized by or subject to the supervision of Baukman. Moreover, even if Baukman and Johnson were coequals in the conspiracy, this incident indicates that the two men worked together, sharing responsibilities and tasks. In this type of co-manager relationship, Johnson can serve as one of the five people organized or supervised for CCE purposes. *See Almaraz*, 306 F.3d at 1041 ("[A] co-defendant also can be a co-manager and can be included as one of the five others with respect to whom the defendant holds a supervisory position." (citing *United States v. McSwain*, 197 F.3d 472, 479–80 (10th Cir. 1999)).

At the level below Baukman and Johnson, the conspiracy relied on Donte Tucker. He was, in essence, a middle manager. Those above him in the conspiracy viewed him as responsible and better able to run the business than some of the other young conspirators, and those below him respected him and liked working for him. (*See* Trial Tr. 138, Jan. 28, 2008, Vol. I.) For a period of time, Tucker was incarcerated, and during that period Custis and Bub oversaw the selling of drugs on various corners. Custis testified that he and Bub were Coles and Baukman's "young boys." (*Id.* at 139.) However, he and Bub were prone to "running around . . . always messing the money up, finding a way to do stupid stuff with the money." (*Id.*) After a while, Coles and Baukman were "getting tired of it. So, they needed somebody that would be able to facilitate it better than we was doing." (*Id.* at 139.) That person was Tucker; he was "their man." (*Id.* at 138–39.) Viewed in the light most favorable to the Government, this evidence supports the

conclusion that Coles and Baukman were not mere wholesale drug suppliers and that they exerted control all the way down to the street-level distribution. As a result, the jury could reasonably conclude that Baukman, Coles's chief lieutenant, had a managerial role. Indeed, this conclusion logically follows from Custis's testimony: both Coles and Baukman were tired of Custis's and Bub's antics and both Coles and Baukman had a role in deciding to bring in Tucker to "facilitate" their business. Such business decisions are clearly decisions of management.

As Tucker rose in the organization, Coles and Baukman decided that he needed more responsibility and they decided that it should come in the form of a new skill. That skill was cooking cocaine. It was Baukman's job to teach, or "coach," Tucker because Baukman was good at cooking cocaine. (*See* Gov't Ex. 267–2883; Trial Tr. 69–70, Jan. 25, 2008.) Some time later, Coles called Baukman to discuss his teaching techniques because Tucker had tested positive for illegal narcotics on a drug test that he was required to take as a condition of his probation. (*See* Gov't Ex. 267–2554; Trial Tr. 72, Jan. 25, 2008.) During the call, Coles and Baukman speculated about the potential causes, guessing that Tucker had been exposed to cocaine because he was not wearing the proper safety gear when he was cooking it. (Gov't Ex. 267–2883.) The jury could reasonably conclude that such a conversation about a setback experienced by a promising mid-level employee is workaday management talk.

Coles and Baukman set Tucker up in a townhouse located in Lansdowne, Pennsylvania, on Essex Street, which was a hub of activity for the conspiracy. When law enforcement raided this property on August 10, 2005, they found overwhelming evidence of a large-scale cocaine operation. At Essex Street they seized a considerable amount of powder and crack cocaine, both pure and adulterated; a 12-ton hydraulic press used to compress cocaine for purposes of

concealment and portability; drug cooking paraphernalia, including pots and pans laced with white powder residue; masks, goggles, and latex gloves for protection from the drug fumes; baking soda for converting powder cocaine into crack; cutting agents for diluting the purity of the cocaine and increasing the volume of saleable product; drug packaging paraphernalia; and numerous firearms and rounds of ammunition.  (Trial Tr. 37–40, 110–30, Jan. 17, 2008; Trial Tr. 14–40, Feb. 7, 2008; Gov't Exs. 526L, 526N, 526O, 526P).  One officer who participated in the raid testified that "[i]f somebody stepped on the carpet too hard or kicked the carpet, you could see [white] powder come up."  (Trial Tr. 41, Jan. 17, 2008.)  Baukman oversaw the procurement and maintenance of the property.  He rented it in the name of his four-year-old son Tauheed Baukman and put the utility bills in his son's name as well.  (Trial Tr. 148, Jan. 31, 2008; Trial Tr. 162, Jan. 17, 2008.)  Tucker lived in the property full-time, and Baukman was there regularly.  (*See, e.g.*, Trial Tr. 162, Jan. 31, 2008.)  Baukman's use of the Essex Street property was confirmed by the presence of a videocassette of Baukman that was "of a personal nature" and the business card of Baukman's attorney that law enforcement officials found in a safe on the property that also contained drugs.  (*See* Trial Tr. 120–25, Jan. 17, 2008; *see also* Gov't Exs. 526U, 526U1, 526T1.)  Given the conversation between Coles and Baukman regarding Baukman teaching Tucker how to cook cocaine and the evidence that Baukman was responsible for the rent and upkeep of the property, a rational jury could certainly conclude not only that Baukman was involved with the activities that went on there, but that he had significant organizational and managerial responsibilities in connection with those activities.

Although Coles and Baukman brought in Tucker as a middle manager, Bub and Custis retained some managerial responsibilities, supervising young boys of their own.  (*See, e.g.*, Trial

Tr. 182, Jan. 28, 2008, Vol. I.)  Bub was Baukman's "homey," his "little friend."  (Trial Tr. 109, Jan. 23, 2008.)  Custis testified that Bub was "[a]nother person that ran . . . [Coles and Baukman's] cocaine operation on the street."  (Trial Tr. 33–34, Jan. 28, 2008, Vol. I.)  This characterization, that Bub "ran," as in operated or organized, the "cocaine operation" on the street for Coles and Baukman, supports the conclusion that Bub was supervised or managed by Coles and Baukman *and* that he himself engaged in supervisory or managerial activities.  As part of his duties, Bub sold drugs with individuals who went by the names Raheem and Ezz.  (*See id.* at 159.)  Although never identified by name, Ezz was described as another one of Coles and Baukman's "youngens."  (*Id.*)  These street dealers used a house on Linmore Street to stash their drugs, which were provided by Coles and Baukman.  (*See, e.g.*, *id.* at 134.)  The evidence was sufficient to support the conclusion that Baukman had a supervisory or managerial relationship with Bub and Ezz, who had a direct relationship with Baukman as his "youngen."

Baukman's managerial control over Custis was clear.  Their relationship was not a mere wholesale drug dealer and street pusher relationship, it was interdependent.  Custis described himself as one of Baukman's young boys, implying the master-protege relationship in which the young boy does the illegal bidding of the older drug dealer.  (*See id.* at 139.)  This testimony was borne out by specific events that Custis described.  As discussed above, when Custis saw Coles being arrested, he contacted Baukman, his superior, to handle the situation.  When Custis and Bub were unable to handle the level of responsibility that Coles and Baukman gave them, Coles and Baukman provided more oversight in the form of Tucker.  Moreover, as Custis's relationship with Coles and Baukman became closer, the drugs were often fronted to Custis—i.e., provided on a consignment basis.  This further supports the existence of supervisory control.  (*See, e.g.*, Trial Tr.

13

74–75, 228–29, Jan. 29, 2008, Vol. I.) *See United States v. Becker*, 892 F.2d 265, 267 (3d Cir.

1989) (observing that consignment agreements "give the provider of the substance the necessary

supervisory control of the participants").

On Cecil Street, Custis supervised a group of young boys, consisting of Troy Wilson, Leroy

Perkins, Barry White, Alfonso Kearny, and Seneca. (Trial Tr. 181–82, Jan. 28, 2008, Vol. 1.)

These young boys sold drugs for Custis, who testified that he was working for Coles and Baukman.

(*See id.* at 182.) Custis's activities on Cecil Street were a "24-hour operation." (*Id.* at 182.) In a

given week, they sold about 4.5 ounces of crack cocaine on the street, 4 ounces of crack cocaine to

people "out in the counties," and 4 ounces of powder cocaine to one of Custis's friends. (*Id.* at

183–85.) Baukman provided cocaine to Custis and his crew on Cecil Street. (*See id.* at 186–87.)

Each of the young boys that Custis supervised in the selling of Coles and Baukman's cocaine can

also count as a person organized, managed, or supervised by Baukman for purposes of analyzing

the third element of the CCE statute. *See Hinojosa*, 958 F.2d at 630; *see also United States v.

Heater*, 63 F.3d 311, 317 (4th Cir. 1995) (noting that "'mere delegation of authority does not

detract from [a defendant's] ultimate status as organizer'" (quoting *United States v. Ward*, 37 F.3d

243, 250 (6th Cir. 1994))). They were part of a chain of agency in which authority was delegated

from Coles to Baukman (sometimes to Tucker) to Custis to the young boys on the street corners.

Custis did Baukman's bidding, and the Cecil Street young boys did Custis's bidding. The evidence

was more than sufficient to count them toward the § 848 five-person requirement. It does not

matter that the Government did not establish a direct link between Baukman and each young boy.

*E.g.*, *United States v. Apodaca*, 843 F.2d 421, 426 (10th Cir. 1988) ("[T]he defendant need not

have had personal contact with each of the five persons involved. The record shows that they were

dealing drugs for a person over whom he had managerial control." (citation omitted)).

In addition to the compelling testimony and physical evidence, the jury saw a film produced by Coles and Baukman that provided insight into how Coles and Baukman viewed themselves and their organization. Titled *New Jack City: The Next Generation*, the movie was conceived of as a combination record promotion and sequel to Warner Brothers' popular 1991 film *New Jack City*. (*See* Gov't Ex. 502Y; Trial Tr. 80–95, Feb. 12, 2008.) The movie depicts the rise of a drug gang, much like the one alleged in the Indictment. Coles portrays the leader, Ace Capone, and Baukman portrays his top lieutenant, Tim Gotti. Several scenes in the movie bear a striking similarity to the evidence heard by the jury. In one instance, Capone refers to Gotti as "my right hand"—the same thing that Coles called Baukman in real life. (*See* Trial Tr. 90–91, Jan. 23, 2008, Vol. I.) In another instance, Capone tells Gotti: "Tim, you *running the daily operation* and make sure the coke cook' right." (Gov't Ex. 502Y (emphasis added).) This dialogue is evocative of the conspiracy's structure and the notion that different people were tasked with the responsibility of running various drug-related activities, such as Bub serving as one of the people who "ran" Coles and Baukman's cocaine operation on the street. It is also evocative of the recorded phone conversation in which Coles instructs Baukman to teach Tucker how to cook crack. And it dovetails with the evidence of Baukman's oversight of the Essex Street property, where some of the daily operations of the real-life drug conspiracy took place. The jury was free to view the film as additional evidence of Baukman's role as a manager and supervisor of the drug conspiracy. *See United States v. Stuckey*, 253 F. App'x 468, 482 (6th Cir. 2007) (non-precedential) (holding that the district court did not err by admitting into evidence rap lyrics written by the defendant where the lyrics described the crime committed by the defendant); *United States v. Wilson*, 493 F. Supp.

2d 460, 463 (E.D.N.Y. 2007) (denying motion to preclude rap lyrics where the lyrics were relevant to the existence of a criminal enterprise).

The Government's evidence against Baukman on the CCE charge was not the bare minimum required to satisfy the sufficiency requirement. It was substantial. Baukman clearly committed a series of felony violations in furtherance of a large-scale cocaine conspiracy, and he clearly committed these violations while managing or supervising more than five people. These people include those he directly organized or supervised, like Johnson, Bub, Custis, Ezz, and Tucker. It also includes those who were organized or supervised by the people he was organizing or supervising, like Troy Wilson, Leroy Perkins, Barry White, Alfonso Kearny, and Seneca. Accordingly, the motion for judgment of acquittal of his CCE conviction must be denied.

### B. Money Laundering (Counts 89–175)

Baukman challenges all of his money-laundering convictions with a one-sentence argument that the Government did not prove that he made any of the transactions with illegal funds. (Doc. No. 767 ¶ 5.) The argument is simply wrong. The Government offered sufficient evidence for the jury to conclude that the transactions charged in Counts 89 through 175 were entered into with the proceeds of statutorily defined unlawful activities. *See* 18 U.S.C. § 1956(c)(7) (setting forth unlawful activities). The jury heard that Baukman had no legitimate source of income or gainful employment and that he met his financial obligations with money earned from dealing drugs. (*See, e.g.*, Trial Tr. 218–28, Jan. 31, 2008; Trial Tr. 10, Feb. 4, 2008, Vol. II; Trial Tr. 165, Feb. 5, 2008; Trial Tr. 20–50, Feb. 8, 2008, Vol. I; Gov't Exs. 704A, 704B.)

To the extent that Baukman's argument that the Government failed to prove that he used illegal funds is based on *United States v. Santos*, 128 S. Ct. 2020 (2008), the argument fails. In

*Santos*, a plurality of the Supreme Court determined that the term "proceeds," as used in 18 U.S.C. § 1956, means "profits" and not "gross receipts" of specified unlawful activities. *Santos*, 128 S. Ct. at 2025. One of Baukman's co-defendants, Asya Richardson, invoked *Santos* to argue that the Government had not proven that the money at issue in her § 1956 conviction was profits from the drug conspiracy, as opposed to gross receipts. The Memorandum and Order denying Richardson's Rule 29 Motion discussed *Santos* at length (Case No. 05-440-18, Doc. No. 1310). In that Memorandum, we concluded that *Santos* does not extend to drug crimes and that § 1956's use of the term "proceeds" means "gross revenue" in the context of drug sales.[5] Like Richardson, Baukman cannot obtain relief under *Santos*.

### C.     Possession of a Firearm in Furtherance of a Drug Crime (Count 63)

Count 63 of the Indictment charged Baukman with knowingly possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1). On August 10, 2005, law enforcement agents found the two firearms charged in Count 63 when they searched Baukman's residence at 2967 Schoolhouse Lane in Philadelphia. (Trial Tr. 173–85, 192, Jan. 30, 2008.) The first was a model M11 Ingram 9 mm pistol. The second was a CM-11 Full Metal Jacket 9 mm pistol with an obliterated serial number. (*Id.* at 181–82.) The guns were located in an unzipped black bag in a closet inside the residence. (*Id.* at 178.) The grip of one of the guns was

---

[5] We based this conclusion on the agreement among the concurring Justice and the four dissenting Justices in *Santos* and subsequent case law. *See Santos*, 128 S. Ct. at 2032 (Stevens, J., concurring); *id.* at 2035–36 & n.1 (Alito, J., dissenting); *see also United States v. Fleming*, 287 F. App'x 150, 155 (3d Cir.), *cert. denied*, 129 S. Ct. 477 (2008), *and cert. denied*, 129 S. Ct. 966 , *and cert. denied*, No. 09–6710, 130 S. Ct. 521 (2009); *United States v. Demarest*, 570 F.3d 1232, 1242 (11th Cir. 2009); *United States v. Ramos*, No. 03–387, 2009 U.S. Dist. LEXIS 69834, at *32 (S.D. Tex. Aug. 7, 2009); *Gamboa v. Norwood*, No. 09–0656, 2009 U.S. Dist. LEXIS 17926, at *10 n.4 (C.D. Cal. Feb. 23, 2009); *United States v. Pope*, No. 08–49, 2008 U.S. Dist. LEXIS 103195, at *4 n.2 (W.D. Pa. Dec. 19, 2008).

exposed.  (*Id.* at 179; Gov't Ex. 503XX.)  Neither gun was loaded, but there were two loaded

ammunition clips in the bag with the guns.  (Trial Tr. 182, Jan. 30, 2008.)  In addition to the guns,

the law enforcement officers discovered $25,000 in bundled cash, a money counting machine, and

several documents related to the drug conspiracy (e.g., a utility bill for the Essex Street property).

(*See* Trial Tr. 185–90, 218–19, Jan. 30, 2008; Trial Tr. 10, Feb. 4, 2008, Vol. II.)

At the close of the Government's case Baukman moved for judgment of acquittal on the

§ 924(c) charge on the grounds that the Government did not prove that he possessed the guns in

furtherance of a drug trafficking crime.  (*See* Hr'g Tr. 6–7, Feb. 11, 2008.)  The essential elements

of a § 924(c) violation are:  (1) the defendant committed either the crime of conspiracy to distribute

and possess with intent to distribute a controlled substance or the crime of possession with intent to

distribute; (2) the defendant knowingly possessed a firearm; and (3) the defendant knowingly

possessed the firearm in furtherance of the crime of conspiracy to distribute or in furtherance of the

crime of possession with intent to distribute.  *United States v. Bobb*, 471 F.3d 491, 496 (3d Cir.

2006).  Baukman's motion challenges the third element of the crime.

The mere presence of a firearm in a defendant's house is not enough to sustain a § 924(c)

conviction.  *United States v. Sparrow*, 371 F.3d 851, 853 (3d Cir. 2004).  Rather, the Government

has the burden of showing that a defendant's possession of the firearm furthered a drug trafficking

offense.  *Id.* (citing *United States v. Ceballos-Torres*, 218 F.3d 409, 414 (5th Cir. 2000); *United

States v. Mackey*, 265 F.3d 457, 462 (6th Cir. 2001)).  The Government may meet this burden

through direct or circumstantial evidence.  *United States v. Iglesias*, 535 F.3d 150, 156 (3d Cir.

2008).  When examining a sufficiency of the evidence challenge to a § 924(c) charge, this Circuit

has adopted the following nonexhaustive list of factors first set forth in *United States v. Ceballos-*

18

*Torres*:

> the type of drug activity that is being conducted, accessibility of
> the firearm, the type of the weapon, whether the weapon is stolen,
> the status of the possession (legitimate or illegal), whether the
> gun is loaded, proximity to drugs or drug profits, and the
> time and circumstances under which the gun is found.

*Sparrow*, 371 F.3d at 851 (quoting *Ceballos-Torres*, 218 F.3d at 414–15); *see also Bobb*, 471 F.3d

at 496 (applying *Ceballos-Torres* factors). "While the location of a firearm is admittedly relevant,

immediate accessibility at the time of search or arrest is not a legal requirement for a § 924(c)

conviction." *Sparrow*, 371 F.3d at 853.

We are satisfied that the Government offered evidence sufficient for a rational jury to

conclude that Baukman possessed the firearms discovered at his Schoolhouse Lane residence in

furtherance of the drug conspiracy alleged in Count 1 of the Indictment. Baukman argues that

since no cocaine was found at his Schoolhouse Lane residence, he cannot have possessed the guns

in furtherance of the conspiracy. (Hr'g Tr. 6–7, Feb. 11, 2008.) This is not an accurate statement

of the law: "Although the usual § 924(c) conviction involves the seizure of a firearm in relative

proximity to drugs, this . . . is not required . . . ." *See United States v. Arzola*, 361 Fed. App'x 309,

313 (3d Cir. 2010) (non-precedential); *see also United States v. Reyes*, 930 F.2d 310, 314 (3d Cir.

1991) (Alito, J.) (affirming a § 924(c) conviction where the defendant was arrested while

transporting drug money—but not drugs—and the firearm was in close proximity to the drug

money). Baukman was capable of taking steps to further the conspiracy from the Schoolhouse

Lane residence. The jury was free to conclude that the $25,000 in bundled cash that law

enforcement found at the property was proceeds of the drug conspiracy. Coupled with the money-

counting machine and testimony regarding Baukman delivering large amounts of cash to Coles, the

$25,000 in bundled cash was sufficient evidence for the jury to conclude that one of Baukman's roles in the conspiracy was to handle the drug money. Moreover, the jury could reasonably have concluded that counting, bundling, and storing the money at Baukman's residence in between the time he received it from his underlings to the time he delivered it to Coles was an essential step in furthering the conspiracy. At the very least, this would allow Baukman to reduce the risk of being robbed by separating an appreciable amount of money from the drugs stored at the Essex Street location.

More importantly, the proximity of the guns to the large amount of drug proceeds constituted strong evidence for the jury to conclude that Baukman used the guns for protection in carrying out his money-handling duties. *See Arzola*, 2010 U.S. App. LEXIS 1159, at *8 (denying Rule 29 challenge to a § 924(c) conviction where the gun was "immediately retrievable for [the defendant] to protect himself, his criminal proceeds, and the continuing viability of the drug trafficking conspiracy"). One of the guns had been modified to function as an automatic weapon. (*See* Trial Tr. 6–8, Feb. 4, 2008, Vol. I.) Baukman was not registered to own an automatic weapon and was not legally allowed to possess it. (*See* Trial Tr. 89–90, Feb. 4, 2008, Vol. I.) *See also* 18 U.S.C. § 922(o) (prohibiting the possession of automatic weapons). The other gun had an obliterated serial number, which made it illegal for Baukman to possess. (Trial Tr. 181, Jan. 30, 2008.) *See* 18 U.S.C. § 922(k) (prohibiting the possession or receipt of "any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce"). One *Ceballos-Torres* factor weighs against a finding that Baukman used the guns in furtherance of the drug conspiracy. That factor is that the guns were unloaded. Nevertheless, the factor is of minimal weight in this context because the close proximity of loaded ammunition clips made the guns functional in short order.

*See Iglesias*, 535 F.3d at 157 (finding that "the proximity of [a] loaded magazine to the gun" was a factor that the jury could have relied on to conclude that "the gun was used 'in furtherance of' [the defendant's] drug-trafficking activities within the meaning of 18 U.S.C. § 924(c)").

The Government's evidence on Count 63 was more than sufficient and Baukman's Motion must be denied.

IV.     CONCLUSION

For these reasons, Baukman's Motion will be denied.

An appropriate Order follows.


                                        **BY THE COURT:**


                                        **/s/** *R. Barclay Surrick*
                                              **U.S. District Judge**