UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 2:05-cr-00440-RBS-8 |
| | : | |
| Plaintiff, | : | |
| v. | : | Philadelphia, Pennsylvania |
| | : | January 26, 2023 |
| TIMOTHY BAUKMAN, | : | 2:32 p.m. |
| | : | |
| Defendant. | : | |

. . . . . . . . . . .

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE R. BARCLAY SURRICK
UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:

| | |
|---|---|
| For the Government: | Francis A. Weber, AUSA |
| | U.S. Attorney's Office |
| | 615 Chestnut Street |
| | Philadelphia, PA 19106 |
| | |
| For Timothy Baukman: | John J. Griffin, Esquire |
| *also known as* | Law Office of John J. Griffin |
| Tauheed Baukman | P.O. Box 571 |
| *also known as* | Lafayette Hill, PA 19444 |
| T Dog | |
| *also known as* | |
| Tim Gotti | |
| | |
| Transcription Service: | O'Connor Legal, Medical & Media |
| | Services, LLC |
| | P.O. Box 384 |
| | South Sutton, NH 03273 |
| | |
| Court Reporter/ESR: | Tashia C. Reynolds |


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

```
                              INDEX


                                            Page:

                        Direct    Cross      Redirect  Re-Cross

WITNESSES:


For the Government:


John J. McMahon, Jr.

(By Mr. Weber)            5

(By Mr. Griffin)                   19


For the Defendant:


Timothy Baukman

(By Mr. Griffin)         37

(By Mr. Weber)                     54



CLOSING ARGUMENTS:

for the Government                            60/72

for the Defendant Baukman                     67
```

```
 1         (Call to Order of the Court)

 2         (Defendant present.)

 3         THE DEPUTY CLERK:   United States District Court in

 4   the Eastern District of Pennsylvania is now in session.  The

 5   Honorable R. Barclay Surrick presiding.

 6         THE COURT:   Afternoon.

 7         FRANCIS WEBER:   Good afternoon, Your Honor.

 8         JOHN GRIFFIN:   Good afternoon, Your Honor.

 9         THE COURT:   Have a seat.

10      (Asides)

11         THE COURT:   All right.  We have the case of

12   United States v. Timothy Baukman.  It's Number 05-440.

13   Counsel, please identify yourselves for the record.

14         MR. WEBER:   Good afternoon, Your Honor.

15   Frank Weber for the Government.

16         MR. GRIFFIN:   Good afternoon, Your Honor.

17   John Griffin for Mr. Baukman.

18         THE COURT:   All right.  Counsel, we're here this

19   afternoon.  Mr. Baukman filed a § 2255 and an Amended § 2255.

20   There are two issues that have been raised and for which this

21   hearing was requested.  Are we ready to proceed?

22         MR. GRIFFIN:   Yes, sir.

23         MR. WEBER:   Yes, Your Honor.

24         THE COURT:   Okay.  All right.  All right.  Counsel,

25   the issues that have been raised are as follows:  Mr. Baukman
```

1  contends that Counsel was ineffective for failing to inform him

2  of possible sentences and of the ability to plead guilty.

3          Mr. Baukman also contends that Counsel was

4  ineffective for failing to introduce the film, Menace, into

5  evidence during the course of the trial.  All right?  I will

6  hear whatever we -

7          MR. GRIFFIN:  Yeah.

8          THE COURT:  You have to say -

9          MR. GRIFFIN:  And Judge -

10         THE COURT:  - with regard to -

11         MR. GRIFFIN:  - just for clarification, there were

12 other issues that Your Honor had denied a evidentiary hearing

13 on.

14         THE COURT:  Yes.

15         MR. GRIFFIN:  So these are the two issues that this

16 Court had allowed us to present evidence on today.

17         THE COURT:  Yes, indeed.

18         MR. GRIFFIN:  Okay.

19         MR. WEBER:  Your Honor, I have Mr. McMahon, who

20 represented Timothy Baukman at trial, here as a witness.  I'll

21 be presenting his testimony.

22         I also would like to, at the end of the hearing,

23 after the evidence is in, include some argument about why

24 Mr. Baukman suffered no prejudice, even if there were errors

25 made here.  But, at this point, I would proceed with

```
 1    Mr. McMahon.

 2              MR. GRIFFIN:  Very well.

 3              MR. WEBER:  Okay.

 4         (Asides)

 5              THE DEPUTY CLERK:  And thank you.  Raise your right

 6    hand.  Do you swear and affirm that the testimony you shall

 7    give this Court is the truth, the whole truth, and nothing but

 8    the truth, so help you God, or you do so affirm?

 9              JOHN MCMAHON:  I do.

10         (The Witness is sworn.)

11              THE DEPUTY CLERK:  Thank you.  And can you please

12    state your name for the record?

13              THE WITNESS:  Jack McMahon, M-C, capital M, A-H-O-N.

14              THE DEPUTY CLERK:  Thank you.

15                        DIRECT EXAMINATION

16              BY MR. WEBER:

17    Q.   Good afternoon, Mr. McMahon.

18    A.   Good afternoon.

19    Q.   Where do you work?

20    A.   I have -- I work in Center City.  I'm a Criminal Law in

21    Philadelphia.  My offices are at 139 North Croskey Street,

22    Philadelphia.

23    Q.   You have your own criminal defense practice?

24    A.   Yes.

25    Q.   How long have you had that practice?
```

McMahon - Direct Examination

1   A.   I was an Assistant DA from '77, I think, to '90 in

2   Philadelphia.  And from 1990 to today, I've been doing all

3   criminal practice.  So that -- what is that?  Ten -- 33 years

4   of defense, criminal work.

5   Q.   Thirty-three years of defense work and then some -

6   A.   Twelve years as an Assistant DA; 45 years of doing

7   criminal work, both as a Prosecutor and a Defense Attorney.

8   Q.   Mr. McMahon, how many trials have you done in your career,

9   approximate number?

10   A.   Thousands, thousands.

11   Q.   And that's both as a DA and as a Criminal Defense

12   Attorney?

13   A.   Correct, I mean, I couldn't even begin to give you a

14   number of 45 years, and that's all I've done.  So, I mean, I

15   never counted them.  But there's a lot of them.

16   Q.   All right.  Did you represent Timothy Baukman in this

17   case?

18   A.   I did.

19   Q.   So, Mr. Baukman made his initial appearance on

20   February 3rd of 2006.  Did you enter your appearance for him

21   shortly thereafter?

22   A.   I'm not real sure the dates.  I don't know when I did it.

23   But I'm sure that if you have records of it, when I entered my

24   appearances, that's when I did it.

25       It was a long time ago, but I did enter my appearance

McMahon - Direct Examination

1   early on in the case.  That's correct.

2   Q.    Okay.  And you represented him through in the trial in

3   this case?

4   A.    I did.

5   Q.    And at sentencing, correct?

6   A.    I did.

7   Q.    The trial concluded in March of 2008, and the sentencing

8   was in November of 2010.  So you represented him for about four

9   years.  Is that right?

10  A.    That sounds correct.

11  Q.    Now, in your practice as a Criminal Defense Attorney, is

12  it your practice to review the Sentencing Guidelines with

13  Defendants who are charged with Federal crimes?

14  A.    Absolutely, it's one of the first things that you do.  In

15  fact, oftentimes, it's one of the first questions that you're

16  asked upon first meeting your Client is:  what are my

17  Guidelines?

18       The Inmates are very well-acquainted with the Federal

19  Guidelines.  And they know that that's a very relevant factor.

20  And it's always almost from the very first meeting you have

21  with them.  The Guidelines are always discussed or in the

22  background, or many, many times, every time.

23  Q.    And does your discussion about the Guidelines include,

24  hey, these are your Guidelines if you go to trial and lose?

25  These are your Guidelines if you plead guilty?

McMahon - Direct Examination

1  A.   Absolutely; the Guideline -- I mean, as we all know, the

2  Guidelines could be very complex.  And you try to go over

3  Guidelines as you know the case to be at the time.

4       Sometimes that changes during the course of the

5  representation, and things come out that may be things that add

6  points that you were not aware of at the time when you first

7  talk with them.

8       So it's an everchanging discussion about the Guidelines.

9  And you always explain to them -- and I did in this case -- how

10  pleading guilty -- the advantage of pleading guilty is twofold

11  in my mind.

12       One, you get the 3-points downward on Sentencing

13  Guidelines.  And you have the argument to the Court at the time

14  of sentencing that you've accepted responsibility.

15       So it's both a numerical and a philosophical situation

16  that you explain to your Client.  I explained to

17  Timothy Baukman and I explain to every Client.

18  Q.   So let's talk a little bit about -

19  A.   And there's -

20  Q.   A little bit -

21  A.   - the other way, too, mind you.  There's the cooperation

22  component of the Guidelines there where you could -- and you

23  always explain this to your Client, not that they're going to

24  do it.

25       But you have to give them that opportunity that

McMahon - Direct Examination

1   cooperation is a -- can be -- especially in a major drug case

2   like this, that cooperation against other Defendants or other

3   people who are not yet charged can result in a § 5K1 Motion,

4   which will reduce your Guidelines, reduce mandatories.

5       So that's always explained to them, too.  And that was

6   explained to Mr. Baukman.  And right from jump street,

7   Mr. Baukman was not cooperating.  He had no intention to

8   cooperate.

9       And I explained to him the benefit of it.  But he didn't

10  want to hear that at all.  I respected him for that and we

11  moved on.

12  Q.   Okay.  So fair to say it is your practice to go through

13  the Guidelines with your Clients -

14  A.   Numerous times.

15  Q.   - when they're in -- charged with these Federal crimes?

16  A.   My practice, and I go over it not just once but numerous

17  times, because I said things change and people's minds change,

18  too.  They may wish to discuss it even further.

19      So it's a constant discussion regarding the Guidelines and

20  what can be done.  And that was done with Mr. Baukman, too.  I

21  mean, he knew what the Guidelines -- he knew what we discussed.

22  We discussed it numerous times.

23  Q.   Okay.  Did your discussions with Mr. Baukman, did they

24  include the fact that he could get that 3-point reduction if he

25  timely pled guilty?

McMahon - Direct Examination

```
1    A.   Absolutely.

2    Q.   Now, you've been practicing -

3    A.   Forty-five years.

4    Q.   - 45 years, 33 years in private practice?

5    A.   Correct.

6    Q.   How does Mr. Baukman compare, in terms of participation in

7    his own defense, and participation in his case?

8    A.   Tim -

9              MR. GRIFFIN:   Objection, Judge, I don't -- I'm not

10   sure what the relevancy of that is.

11             THE COURT:   Counsel?

12             MR. WEBER:   Yes, Judge.  I'm attempting to establish

13   that Mr. Baukman was engaged with Mr. McMahon.  And when they

14   spoke, the two of them understood what was going on.  And that

15   goes to Mr. Baukman's understanding that the 3 points were

16   discussed with him.

17             MR. GRIFFIN:   I don't have a problem if that's the

18   question.  But I think the question was sort of how Mr. Baukman

19   compared with other Clients that he was dealing with.  I'm not

20   so sure the relevance of that aspect.

21             THE COURT:   Well -

22             MR. WEBER:   I was attempting to lay some foundation,

23   Your Honor.  But I can cut right to the chase.

24             THE COURT:   All right.

25             BY MR. WEBER:
```

McMahon - Direct Examination

1  Q.   When you spoke with Mr. Baukman about the Guidelines, did

2  he understand the Guidelines?

3  A.   Yes, I mean, Timothy -

4  Q.   And -

5  A.   - in my impression of him, in my discussions with him,

6  he's a very intelligent young man.  He -- I mean, I really

7  believe that.

8       He has real capabilities and he's a bright guy, and

9  understands things.  And many Clients, it may take four, five

10 times to explain things to them, because they're not.

11      But Timothy was bright, understood, asked relevant

12 questions, and was fully engaged in the discussions regarding

13 almost every aspect of the case, and that included the

14 Guidelines.  That included cooperation; that included pleading

15 guilty.

16 Q.   All right.  Mr. Baukman obviously proceeded to trial.  Was

17 there ever a time where he wanted you to engage in plea

18 discussions?  Or was he dead set on a trial from the beginning?

19 A.   Mr. Baukman was always, from the beginning, intent on

20 going to trial.  Mr. Baukman and I discussed that numerous

21 times.

22      And even though he knew what the Guidelines are, even

23 though he knew the potential penalties, he believed -- and I

24 don't think it was totally unjustified -- that he had some

25 issues and some legitimate issues and abilities to defend this

McMahon - Direct Examination

1    case.

2         The evidence in the case was a lot of tapes, a lot of

3    things.  And he wasn't really on those.  And his connection to

4    this conspiracy was limited to certain things.

5         And so, we believed that -- and with Mr. Baukman -- that

6    if we took a tact of that we weren't part of this big group,

7    that this was very limited, that I don't have that association

8    with Mr. Coles.  I wasn't his righthand man, as the Government

9    said.

10        That they didn't really have any evidence to dispute that

11   defense; and so, we believed that we had a shot, as they say in

12   our business.  We thought we had a shot.  We thought that it

13   could go well.

14        There were some intangibles that we weren't sure of.  One

15   was his girlfriend at the time.  He was under the belief, and

16   we were under the belief, that maybe -- or he was, that she may

17   not testify, or not testify the way the Government thought she

18   would testify.

19        And that was always the back-and-forth with Mr. Baukman.

20   He didn't think she would.  I informed him that I seen it too

21   many times where people say they're not going to do that to

22   your face, but then they walk right in the courtroom and

23   testify.

24        Well, as we now know, she did testify.  And she really put

25   some significant issues into our defense in that case.

1  Q.   Now, you're talking a little bit about your theory of the

2  case?

3  A.   Right.

4  Q.   In your last answer, you're trying to establish that the

5  evidence of conspiracy was not sufficient?

6  A.   Again -

7  Q.   Is that -

8  A.   - this is a long time ago.  But I remember that the -- and

9  again, I'd have to -- the general theory of the defense with

10  Mr. Baukman is that he was tangentially involved, that he

11  wasn't the righthand man, that he wasn't part of this corrupt

12  organization, that he really didn't have that kind of

13  relationship with Mr. Coles.  He wasn't his righthand man.

14      I believe even in my closing -- and I had -- and I just

15  note this specifically that I had charts that I had done to try

16  to show the organizational component of this, that we weren't

17  part of that organization, because, obviously, that's a big --

18  if we were to get only the drugs that were found in Essex House

19  Street, the house, it would be a significantly different

20  penalty.

21      So it was really important to try to remove the conspiracy

22  and corrupt organizations out of the case.  And I thought we

23  had a shot at it.

24      And that was more of our defense was that there wasn't

25  evidence to show that linkage, or to show that managerial or

1    direction by Mr. Coles to Mr. Baukman, because there weren't

2    tapes to reflect that.

3        There wasn't real significantly hard evidence to refute

4    that.  And I thought that was our best chance to move forward.

5    And we discussed that many times, Mr. Baukman and I.

6    Q.   Okay.  The Lead Defendant, Alton Coles, he testified at

7    trial, correct?

8    A.   Yes, he did.

9    Q.   All right.  He testified at some length that the drug

10   paraphernalia and other items seized were props for music

11   videos, correct?

12   A.   That, and that all the references to drugs that are all

13   through the tapes, through all through everything wasn't

14   cocaine.  It was cut.  And that was -

15   Q.   Right.

16   A.   It was the -

17   Q.   So it's -

18   A.   - great cut conspiracy that they were -- we were really

19   involved in, according to Mr. Coles, that we weren't into any

20   kind of drugs or anything like that.  This was a massive cut

21   organization.

22   Q.   Okay.  Now, in support of what I'll call the prop theory,

23   Mr. Coles' Attorney introduced a music video called New Jack

24   City, correct?

25   A.   Yes, he did.

1   Q.   And Mr. Coles also testified at-length about another movie

2   called Menace?

3   A.   Correct.

4   Q.   How, in your view, did Alton Coles' testimony help or hurt

5   Mr. Baukman?

6   A.   Well, let me say this to you.  Mr. Coles' testimony -- I

7   was sitting right there.  I was sitting next to him.  And he

8   testified.

9        And I have to say this.  And I've said this outside of

10  this courtroom at other times.  In 45 years, that was the most

11  ridiculous testimony I ever heard in my entire life.  It was

12  absurd.

13       And to sit there and say that all this was props and it

14  was cut, with all the tapes and all the evidence that was

15  seized, was ludicrous.  I mean, it literally was ludicrous.  I

16  mean, it was so bad.  It was embarrassing.

17       And Mr. Baukman, who's seated next to me, I remember

18  making comments to me about that same thing, that it was

19  ludicrous and absurd.  I mean, it just was so beyond any sense

20  that you couldn't even deal with it.

21  Q.   So, fair to say, you didn't think the prop defense was a

22  worthy defense in the case?

23  A.   It was absurd.  It was absurd, and because not only he --

24  as far as Mr. Baukman's concerned, it's even more absurd,

25  because that wasn't our defense.

McMahon - Direct Examination

1        The absurd -- our defense was completely different from

2    that, oh, this was cut.  And the first time I ever heard that

3    story about cut was when Coles testified on the witness stand.

4        My Client never told me about any cut or any theory of it

5    being cut.  First time I ever heard it was when he got up here,

6    sitting right where I am, and said that ridiculous story.

7    Q.   Now, what, if any, discussions did you have with

8    Alton Coles' Attorney, Chris Warren, about whether Coles should

9    continue testifying?

10   A.   I told him, what?  I sat there and asked him, what, in the

11   world, was he doing?  As a Lawyer, I could not fathom how he

12   thought this was advancing his interest to putting that -- I

13   mean, it is a defense.

14       I mean, the case against Alton Coles was pretty

15   overwhelming in many, many ways.  And maybe he thought that

16   this was a Hail Mary or something that he could maybe pull out.

17   And maybe somebody would believe this nonsense.

18       But, to me, it was not advancing his best interests.  And

19   to me, I thought it was just embarrassing.  And I really didn't

20   want to even associate with that defense, because I think it

21   hurt your credibility with the jury.  It's like you're almost

22   spitting at the jury saying believe this nonsense.

23       And I didn't argue that.  I didn't pursue that defense.  I

24   didn't think that was a good defense.  And I still don't think

25   it was a good defense.

McMahon - Direct Examination

1  Q.   In your discussions with Mr. Baukman leading up to the

2  trial, did you discuss with him whether to admit the Menace

3  tapes?

4  A.   It was never our intention to introduce any of those tapes

5  or to go with the prop defense, or that this was -- that was

6  never even discussed or thought about.  Again -- and I know

7  about the issues with presenting Menace.

8       A, for Menace to be helpful to Mr. Baukman, okay, would

9  need explanation, okay, as to what it was, because Mr. Baukman

10 was in the production and whatnot.  Well, Mr. Baukman was never

11 going to testify.  We had made that decision a long time ago.

12      So that part didn't -- even if they just ran the movie,

13 Menace, without Mr. Baukman's explanation of what that means or

14 how it is relevant to his defense, was of no value.  And I

15 don't know how you would have introduced it or how it would

16 have been relevant without his explanation.  And he wasn't

17 testifying.

18      Second of all, after watching Mr. Coles testify about New

19 Jack City and the various other stories about props and cut,

20 and all these other things, I wanted to be as far away from

21 that nonsense as I possibly could, to be honest with you.

22      To me, to put on Menace and try to buy into that same

23 nonsensical argument, to me, would have been ineffective

24 assistance.  And I was not intending do that.

25 Q.   During jury deliberations, the jurors sent a note asking

1  -- or requesting the Menace video.  It hadn't been admitted -

2  A.   Correct.

3  Q.   - into evidence?  At that point, were you still of the

4  mind which you just testified about that the Menace tape would

5  not have provided any benefit to your Client, Mr. Baukman?

6  A.   Zero; there was no -- that it was not admitted into

7  evidence.  It was Chris Warren who presented all of that stuff

8  about the things.

9      And all we said at the time was it wasn't admitted into

10  evidence.  So it can't be sent out.  But I darn sure would not

11  have put that Menace in, myself.  And I'm not sure how I would

12  have, without Baukman testifying.

13      But second of all, again, I was trying to distance myself

14  from that and keep credibility with the jury as to my legal

15  arguments and my evidence, and quality of evidence arguments,

16  as to the corrupt organization and the conspiracy, and the

17  levels that would be responsible for Mr. Baukman, because I

18  thought that was a viable defense.  It was a sensible defense.

19  And that one with Menace and props, and cuts was a nonsensical

20  defense.

21  Q.   Okay.  And just to summarize, it was your view that, if

22  you were arguing to the jury this, in your view, ridiculous

23  defense, they would not go along with what you thought was a

24  viable defense, which was the lack of evidence of Mr. Baukman's

25  involvement in the -

```
 1  A.   Right.

 2  Q.   - organization?

 3  A.   The jury -- and I've tried a million juries in my life.

 4  And credibility, as with witnesses, it's important for the

 5  Lawyers, too.

 6       They have to -- you're selling something to them.  You're

 7  selling an idea or a concept to them that you're hoping they'll

 8  buy.  Well, if you start your sales pitch with nonsense, then

 9  you're two strikes already behind at that point in time.

10       And again, to me, there was no value in going down that

11  route.  It was nonsensical.  It was not going to win.  And to

12  me, it would just hurt Mr. Baukman's legitimate defense that I

13  believe we had, and we argued very strongly for.

14  Q.   Thank you, Mr. McMahon.

15           MR. WEBER:   Those are all the questions I have.

16  Thank you.

17           THE COURT:   All right.

18                   CROSS EXAMINATION

19       BY MR. GRIFFIN:

20  Q.   Mr. McMahon, good afternoon.

21  A.   Good afternoon, sir.

22  Q.   Mr. Man [sic], let me just ask you a question.  From the

23  time you first got involved to let's say the trial, do you

24  recall how many times you might have visited with Mr. Baukman?

25  A.   No.
```

1   Q.   Would it have been numerous?

2   A.   I have no recollection of how many times.  I just -

3   Q.   Okay.

4   A.   - can't even begin to tell you.

5   Q.   Okay.  Now, like for instance, today, do you communicate

6   with your Clients through CorrLinks?

7   A.   Yes.

8   Q.   Okay.  CorrLinks, if I recall, wasn't even available back

9   then, right?

10  A.   I don't know.

11  Q.   Okay.  So, communication would have been either a

12  visitation or a letter, or a phone call?

13  A.   Phone call, correct.

14  Q.   Okay.  Do you recall at different times receiving letters

15  from Mr. Baukman?

16  A.   I don't recall.

17  Q.   Okay.  Would you at least agree that it's certainly

18  possible that he sent you numerous letters over the course of

19  time?

20  A.   I would agree that's possible, sure.  I'm not -

21  Q.   Okay.

22  A.   - saying it didn't happen or it did.  I just don't

23  remember.

24  Q.   Okay.  Do you ever recall either in your memory or

25  reviewing the file whether you would ever respond back to him

McMahon - Cross Examination

1   in a letter?

2   A.   I don't recall.

3   Q.   Okay.  And were there oftentimes phone calls that would

4   come in from the prison?

5   A.   Very possibly; again, this is 15 years ago.

6   Q.   Right.

7   A.   Sixteen years ago.

8   Q.   Okay.

9   A.   I mean -

10  Q.   So the -- for lack of a better way of putting it -- the

11  meat and potatoes of your discussions with Tim Baukman would be

12  those times where you met with him in-person -

13  A.   I -

14  Q.   - correct?

15  A.   - can't answer that question.  I know we discussed this

16  case many times.  And I don't know how many.  And I know we

17  were thoroughly prepared to handle the case.

18  Q.   Okay.  But the format of communicating with him, it likely

19  was whatever occurred during in-person visits, as opposed to

20  letters -

21  A.   I can't -

22  Q.   - or phone calls?

23  A.   - answer that question.

24  Q.   Okay.  Do you still have your file?

25  A.   That's a good question; I don't know.  Probably not,

```
 1   because what happened was -- probably not, and the reason for
 2   that is I had a storage area at 2020 Arch Street.  And I had
 3   all my files stored there.
 4        And if you recall, it was about two years ago.  We had
 5   that huge flood here in Center City.
 6   Q.   Um-hmm.
 7   A.   And 2020 Arch, the whole basement got flooded.  And I went
 8   over to get my -- I had a whole room -- I mean, a big room full
 9   of files, trash.  They're boxes and they were just -- they had
10   to be taken out by -
11   Q.   Right.
12   A.   So I -
13   Q.   The -
14   A.   - don't know that.  But I would be -
15   Q.   Okay.
16   A.   - pretty darn sure that that Baukman's file -
17   Q.   It -
18   A.   - being the age it was, was in that rumination that was -
19   Q.   The -
20   A.   - caused by the flood.
21   Q.   - last time that you ever recall taking a look at your
22   file, whenever that was, do you recall ever seeing letters that
23   you responded or sent back to Mr. Baukman?
24   A.   I don't remember.
25   Q.   Okay.  Now, your position is that you discussed with him
```

1  the Sentencing Guidelines and everything else?

2  A.   Mr. Griffin, of course.  Of course, of course, of course.

3  Q.   Just -

4  A.   You know that -

5  Q.   - I -

6  A.   - as well as anybody that that is a discussion that I have

7  with every Client, that I had with Mr. Baukman.  And

8  Mr. Baukman was very familiar with it.  And to say otherwise is

9  just not true.

10  Q.   Okay.  Do you recall getting a letter or a series of

11  letters from Mr. Baukman asking you to find out if they were

12  going to make a plea, or if there was going to be a plea offer,

13  or to explore -

14  A.   I don't.

15  Q.   - other plea options?

16  A.   I don't remember that.

17  Q.   Okay.  He was clear.  Tell me if I'm wrong.  He was clear

18  to you, whether it was in conversations or letters, that he was

19  not interested in cooperating.  Am I correct?

20  A.   That's 100-percent sure, that -

21  Q.   Oh.

22  A.   - I do recall definitely.

23  Q.   Okay.  But you cannot recall whether or not you had

24  received any letters from him asking about plea options?  Is

25  there anything that could be done outside of cooperating?

1  A.   Oh, I'm sure we had those discussions, whether by letters

2  or in-person.  I'm sure.  I mean, because obviously minimizing

3  the time, I mean, he was facing a very -- as we know -- a very

4  serious case.

5       And the main -- the discussion of time and whatnot was

6  discussed with him.  And I mean, the options that you had, I

7  mean, they weren't offering any C Pleas in his case, which is

8  the negotiated fixed time.

9       So in my mind, the only thing that was even discussed at

10  any time with Mr. Lloret, who was the Prosecutor, was that they

11  could plead open to the thing and get 3 points down.  And

12  that's the only thing we could get -

13  Q.   But -

14  A.   - other than the coop -- well, let me finish my answer.

15  And the cooperation was out.  So that § 5K1 was out.  There was

16  no C Plea.

17       So the only other option, as you know, is to plead to the

18  conspiracy and the whole thing, and get 3 points down.

19  Mr. Baukman was not interested in that, because the Guidelines

20  were too high.

21  Q.   Okay.  But was that discussed with him at least at a

22  minimum that he would have an ability to plead guilty?

23  A.   Oh.

24  Q.   Get 3 points down, and then perhaps pursue whatever

25  potential departure issues there may be, if there were any?

McMahon - Cross Examination

1   Was that discussion -

2   A.   Sure.

3   Q.   - at -- in response to letters that he had sent you to

4   explore that?

5   A.   Absolutely; I mean, but, again, there wasn't -- yes, the

6   answer is yes.  I mean, I explained to Mr. Baukman clearly.

7   And really the options are, in this Federal System, as we know,

8   are either cooperation.  That's one way to get your Guidelines

9   down and out of mandatories.

10       The second way -- or the other thing would be to plead

11   open and get 3 points down.  Or three, a C Plea, which would

12   cap either the Guideline or the specific time.  No C Plea was

13   being offered at all, no matter -

14   Q.   There were C Pleas offered -

15   A.   Not to me.

16   Q.   - to others?

17   A.   Not to me.

18   Q.   Well -- yeah, and I'm not saying that there was.  But

19   there were some C Pleas offered in the case.  For instance,

20   Keenan Brown, gentleman here in the room in the back, had been

21   offered a C Plea.  And then, I believe it fell apart for other

22   reasons?

23   A.   I don't think anybody got a C Plea in this case that went

24   to sentencing.  But again, my -

25   Q.   You mean that -

1    A.    But my guy -

2    Q.    - went to trial?

3    A.    Huh?

4    Q.    Went to trial; was by sentencing, the C Plea's out the

5    door, you would think, right?

6    A.    Oh, absolutely.  But you understand.  I mean, to me, there

7    were a number of people in this case that never should have

8    went to trial.  You had these young ladies over here that

9    should have pled -

10   Q.    Right.

11   A.    - in my mind and cooperated against Mr. Coles, and gotten

12   a § 5K1.  I mean, it was not -- to me, a tragedy for those

13   girls who were merely being used in my opinion to be sitting

14   here at this trial and facing the type of penalties that they

15   were facing.

16         But as far as Baukman was concerned, we had limited

17   options.  Cooperation:  out of the ballpark.  No C Plea; so we

18   had open plea or trial.

19         Wasn't taking an open plea, because he felt -- and I felt

20   we had a shot, too.  But it's certainly his decision -- that

21   there could be a way around the higher Guidelines of a

22   conspiracy and corrupt organization.  And we could limit the

23   Guideline numbers by a trial in some fashion.

24   Q.    So you thought the best option was to go to trial?

25   A.    I didn't say that.

McMahon - Cross Examination

 1              MR. WEBER:    Objection, Your Honor.  That misstates

 2   the record.

 3              THE COURT:    The objection's -

 4              MR. GRIFFIN:    Well -

 5              THE COURT:    - sustained.

 6   A.    I -- here's the thing.  Here it is, Mr. Griffin.  What I

 7   say to my Clients all the time is this.  I never tell them it's

 8   the best thing to go to trial.  I never tell them that, because

 9   it's not my decision.

10        I've had Clients where I've told them I 100-percent think

11   you should plead.  I do think you should plead.  You have

12   really no defense at all.  But it's up to you.  And I've tried

13   those cases, believe me, where they've had no defense at all.

14   But then wanted to go to trial.

15        With Mr. Baukman, I never said to him -- when we talked,

16   Mr. Baukman and I, about the defense that we were going to

17   pursue, that is what we've already talked about, he was onboard

18   with that.  He understood it.

19        And I told him that that may be a way to get the

20   Guidelines to be different than just pleading and getting

21   3 points down, because obviously if we were only found guilty

22   of what was in Essex House, in Essex Avenue, as opposed to the

23   conspiracy and the corrupt organization, we'd be in a far

24   better place with the Guidelines.  And -

25   Q.    Um-hmm.

McMahon - Cross Examination

1   A.   - to me, that was a sensible argument.  In other words, it

2   wasn't crazy town.  And so, sometimes when your Client tells

3   you a defense and it's crazy town, this wasn't crazy town.

4        And I think we made a good presentation of it at trial.

5   Like I said, some things hurt us.  And we started off with a

6   theory and we had certain arguments as to the Essex House that

7   we intended to pursue.

8        The girlfriend, Tiffany, I believe her name was.  She came

9   into court.  We weren't sure whether she was or wasn't, and

10  what she was going to say.  But obviously she did come in and

11  she did hurt in that regard.  So I mean -

12  Q.   Right.

13  A.   But again, we weren't sure.  And so, our defense was --

14  like I said -- our defense was much more nuanced than the

15  ridiculous prop theory.

16  Q.   And I know your file is gone or lost, but -

17  A.   I assume it is.  I'll -

18  Q.   Yeah, no.

19  A.   - look if you want.

20  Q.   Well, no, no.

21  A.   I don't -

22  Q.   I -

23  A.   - know.

24  Q.   - take you at your word.  All I'm saying is, whenever it

25  was that you last looked at your file -- or maybe you can tell

McMahon - Cross Examination

```
 1   me on your personal style -- do you generally memorialize
 2   following a conversation with a Client, I spoke with him?  I
 3   went through this issue.  I went through that issue.  Is that
 4   your style?
 5   A.   No, no, it's not.
 6   Q.   No?
 7   A.   No.
 8   Q.   Never have?
 9   A.   I mean, I'll take the old pen to interview a guy.  And
10   then, when it's about the story, I'll write things down.  But I
11   don't necessarily -- I don't, like, come back and write a Memo
12   to the file.  I know some people do that.
13   Q.   Okay.
14   A.   Maybe I should, but I don't.  And I just -
15   Q.   But that's not your style?
16   A.   No, it's not.
17   Q.   Okay.
18   A.   Never has been.
19   Q.   Okay.  Now, this issue having to do with the Menace video,
20   did you ever watch the Menace video?
21   A.   Um-hmm, I've -
22   Q.   Okay.
23   A.   - seen it.
24   Q.   How long was it?
25   A.   I don't have -
```

McMahon - Cross Examination

1   Q.   Do you know?

2   A.   - a recollection.  It was a hip-hop video of some kind.  I

3   don't remember, to tell you the truth.  It was a -- Menace was

4   a -

5   Q.   Okay.

6   A.   Some sort of video of a -

7   Q.   And your understanding, at least from Mr. Baukman, whether

8   or not you agreed with this or not nor in however it played

9   out, that a lot of those items in that movie -- for instance, a

10   money counter, drugs, guns -- they were essentially props for

11   that particular movie.  Am I correct?

12   A.   That's what they said.

13   Q.   Okay.  But that's what -

14   A.   That's what Alton Coles said.

15   Q.   No, no, no.  But forget about Alton Coles.  Your

16   understanding from Mr. Baukman was that these items -- because

17   he was the Producer and Director of this movie -

18   A.   I -

19   Q.   - right?

20   A.   - remember that, yeah, they made this movie and that there

21   were props in the movie that they said were not cocaine and not

22   real guns.  I mean, there was no way to verify that,

23   necessarily.

24        But Mr. Baukman, I do recollect telling me that movie,

25   Menace, had props in it.  Yes.  Props in it, such as guns.

1   Q.   Okay.

2   A.   Such as that the -

3   Q.   So -

4   A.   - powder wasn't really cocaine.

5   Q.   - forgetting -

6   A.   He did tell me that.

7   Q.   - about the apparent absurdity of Coles' testimony, why

8   did you not think that introducing the Menace video as to

9   Tim Baukman would have some value, if, in fact, they were

10  props?

11  A.   Has no value, because our defense wasn't props,

12  Mr. Griffin.  If our defense was that, I would -- it may have

13  some merit, although I still don't think it would.

14       But the defense, no time did I argue -- no time did I

15  argue that this was cut.  No time did I argue that those were

16  just props; no time did I argue in any -- it wasn't the theory

17  of the defense.

18  Q.   But -

19  A.   So introducing the props when the props are not your

20  defense doesn't make sense, number 1.  Number 2, I think

21  putting that whole movie in -- again, my defense was to try to

22  distance myself from Alton Coles, distance myself from this and

23  say I'm not a Manager.

24       This film puts them all together, gets them all active

25  together in a bunch of stuff.  That wouldn't be helpful to my

McMahon - Cross Examination

1   real defense.

2   Q.   Okay.

3   A.   So that wouldn't be helpful.  And number 3, how do you get

4   in?  I'd introduce it with Mr. Coles, who was the worst witness

5   I ever seen in my life?  I'm -

6   Q.   Okay.

7   A.   - not going to introduce Menace to -- think about this for

8   a minute.  I'm going to introduce a tape of my guy's produced

9   video that's consistent with the most ridiculous story I've

10  ever heard, and then argue that to the jury when my defense

11  isn't that?  That's nonsense.

12  Q.   But let me ask you this.  If, in fact, that video depicted

13  props and not real drugs, so to speak, okay?  Just picture

14  that.

15  A.   Okay.

16  Q.   Accepting that to be true -

17  A.   Fine.

18  Q.   - well, why would that not have been value -

19  A.   How does -

20  Q.   - to show to the jury that all that they saw that the

21  Government believed were significant amount of drugs was, in

22  fact, soap?

23  A.   No.  Well -

24  Q.   Or some other type -

25  A.   - A -

McMahon - Cross Examination

```
 1  Q.   - of prop?

 2  A.   - that wasn't my defense.  B, you don't know that that

 3  was.  That was Alton Coles' version that that's what it was.

 4  Q.   Well, but Tim -

 5  A.   Wait, let me finish.  Can I finish my -

 6  Q.   But didn't -

 7  A.   - answer, please?

 8  Q.   - Tim Baukman -

 9  A.   No, you're not -

10  Q.   - tell you that?

11  A.   - letting me finish.

12  Q.   Didn't Tim Baukman tell you -

13          THE COURT:   Let him -

14          BY MR. GRIFFIN:

15  Q.   - that?

16          MR. WEBER:   Your Honor -

17          THE COURT:   - him answer the question.

18          MR. GRIFFIN:   Very well.

19  A.   So what?  Tim Baukman wasn't testifying.

20          BY MR. GRIFFIN:

21  Q.   But you had -

22  A.   So let me finish.

23  Q.   - other ways to -

24  A.   You're not -

25  Q.   - get it in -
```

1    A.   - letting me finish -

2    Q.   - didn't you?

3    A.   - my answer, sir.

4    Q.   Go ahead.

5    A.   Number 1, there was never ever with Mr. Baukman and me a

6    discussion about introducing the Menace tape.  In fact,

7    Mr. Baukman, himself, after Alton Coles testified, was also

8    embarrassed and shocked by that testimony, and that we were --

9    and I remember discussing with him that this is the most

10   ridiculous testimony.  And he agreed.

11       We were -- our goal was to distance ourselves from that

12   ridiculous story and try to stick to our theory, rather than go

13   ahead and introduce Menace and go in and come back with this

14   nonsense about cut and all that, and join into that messy

15   defense and sloppy defense.

16       I wasn't doing that.  And no good Lawyer would have.  He'd

17   be a fool.  That would have been ineffective assistance.

18   Q.   But, if you knew those items -- at least, from your Client

19   -- you knew those items were, in fact, props, and you had other

20   ways to possibly get that in, other than Tim Baukman -

21   A.   How?

22            MR. WEBER:   Objection, Your Honor -

23            MR. GRIFFIN:   Well -

24            MR. WEBER:   - he's answered the question.

25            MR. GRIFFIN:   No, well, I think I'm allowed to, in

McMahon - Cross Examination

1    terms of admissibility.

2            THE COURT:   The objection's overruled.

3            BY MR. GRIFFIN:

4    Q.   Do you know who Chris Schwartz is?

5    A.   I have no idea who that is.

6    Q.   Okay.  Chris Schwartz was a Co-Producer of this film with

7    Tim Baukman?

8    A.   I have no idea.

9    Q.   Okay.  Assuming that to be true, okay, couldn't he have

10   testified -

11   A.   I assume he could.

12   Q.   - as to the video?

13   A.   I never would have done it in a million -

14   Q.   All right.

15   A.   - years.

16   Q.   Okay.

17   A.   To this day, I would not do that.  You wouldn't do it.

18   Any Lawyer that has two brain cells that rub together would not

19   introduce that Menace testimony, when the defense I had was

20   what I had.  If you do that, it would be malpractice.

21   Q.   And you're basing that on what you believe to be the

22   almost-laughable performance of Alton Coles' testimony?

23   A.   That was my strategy, that was my job.  That was my -

24   Q.   Okay.

25   A.   - reasoned, professional, legal strategy in this case that

McMahon - Cross Examination

1  introducing -- I mean, and I'll be honest with you,

2  Mr. Griffin.  I never even thought.

3      It wasn't like sometimes we, as Trial Lawyers, we debate.

4  Are we going to try to introduce this piece, or are we going to

5  do it?  Are we going to do it?  I will or I won't.  Never did I

6  think about introducing Menace, nor do I think so today, nor

7  did I then, nor would any Lawyer think so.

8  Q.   All righty.

9          MR. GRIFFIN:   Judge, I have no further questions.

10         THE COURT:   All right.

11         MR. GRIFFIN:   Thank you.

12         MR. WEBER:   Judge, I actually -- I have no redirect.

13         THE COURT:   You may step down.

14         THE WITNESS:   Thank you, Your Honor.

15     (The Witness is excused.)

16                        GOVERNMENT RESTS

17         MR. GRIFFIN:   Judge, if I may, I'd like to call

18 Mr. Baukman.

19         THE COURT:   All right.

20         MR. GRIFFIN:   Judge, up there or seated there?

21 What's your preference?

22         THE COURT:   You may come up.

23         MR. MCMAHON:   Do you wish me to remain, Your Honor?

24         THE COURT:   Excuse me?

25         MR. MCMAHON:   Do you wish me to remain?

Baukman - Direct Examination

```
 1              THE COURT:   You don't have to.
 2              MR. WEBER:   Yeah, I don't have anything further with
 3  Mr. McMahon.
 4              MR. GRIFFIN:   I don't have anything further, either.
 5              MR. MCMAHON:   Okay.  I didn't know if you did or
 6  not.  I'm going.  One second, Your Honor.
 7         (Asides)
 8              THE DEPUTY CLERK:   Please raise your right hand,
 9  sir.  Do you swear and/or affirm that the testimony you shall
10  give this Court shall be the truth -
11              THE DEFENDANT:   Yes.
12              THE DEPUTY CLERK:   - the whole truth, and -
13              THE DEFENDANT:   I do.
14              THE DEPUTY CLERK:   - nothing but the truth so help
15  you God, or you do so affirm?
16              THE DEFENDANT:   I affirm.
17         (The Witness is sworn.)
18              THE DEPUTY CLERK:   Thank you.  And can you please
19  state and spell your name for the record?
20              THE WITNESS:   Timothy Baukman, B-A-U-K-M-A-N.
21              THE DEPUTY CLERK:   Thank you.
22                        DIRECT EXAMINATION
23              BY MR. GRIFFIN:
24  Q.   Before I proceed, Mr. Baukman, you've got notes here that
25  we've talked about that maybe you may want to refer to.  Do you
```

1    need them?

2    A.    Just in case, I mean -

3    Q.    Okay.

4            MR. GRIFFIN:    Judge, may I approach?

5            THE COURT:    Yes.

6            BY MR. GRIFFIN:

7    Q.    Mr. Baukman, these are, in fact, notes, correct?

8    A.    Yes.

9    Q.    Your notes; Mr. Baukman, just to go through some ground

10   rules with you, if I can, we've filed a § 2255 Petition,

11   correct?

12   A.    Yes.

13   Q.    And the Court, as it discussed, granted a hearing on two

14   particular issues?

15   A.    Yes.

16   Q.    So you understand we're going to focus today on those two

17   issues and not any other issues that the Court did not grant a

18   hearing on.  You understand that?

19   A.    Yes.

20   Q.    Okay.  So, you get indicted in this case and then retain

21   Mr. McMahon early on.  Is that correct?

22   A.    No, I retained Mr. McMahon after I was served a Search

23   Warrant, six months before I was arrested.

24   Q.    Okay.  So he was -

25   A.    He was -

1  Q.   - in -

2  A.   - retained on the street.

3  Q.   Okay.  So, he was your Lawyer before you even got indicted

4  and arrested.  Is that -

5  A.   Yes.

6  Q.   - correct?

7  A.   Yes.

8  Q.   And once you were indicted, you remained in custody from

9  that point in time-forward, correct?

10  A.   Yes.

11  Q.   And have essentially remained in custody since, is that

12  correct?

13  A.   Yes.

14  Q.   Now, issue number 1 that this Court had granted an

15  evidentiary hearing on has to do with whether or not

16  Mr. McMahon had discussed with you the Sentencing Guidelines -

17  A.   Yes.

18  Q.   - and their effect on what happens if you go to trial, or

19  if you don't go to trial, or if you plead guilty, or you don't

20  plead guilty?  And then, also your ability to enter into a

21  guilty plea in some fashion, follow me?

22  A.   Yes.

23  Q.   So in terms of the Sentencing Guidelines, do you ever

24  recall Mr. McMahon specifically going through the Sentencing

25  Guidelines with you?

Baukman - Direct Examination

1   A.   No, we never went through the Sentencing Guidelines, ever.

2   Q.   Okay.  Were you aware of the penalties you were facing,

3   essentially, other than just the maximum penalties?

4   A.   Not really.

5   Q.   Okay.  Now, let's put this in context a little bit.  You

6   may have heard me ask Mr. McMahon this question.  Back then --

7   and then isn't all that long ago -- but back then you could

8   either call your Lawyer?

9   A.   Um-hmm.

10  Q.   You could see him in-person?

11  A.   Um-hmm.

12  Q.   Or you could write him a letter.  Am I correct?

13  A.   Yes.

14  Q.   And I made a statement to Mr. McMahon.  Correct me if I'm

15  wrong.  But back then, CorrLinks was not in existence, correct?

16  A.   No, CorrLinks, I believe they put it in 2008 or '09,

17  somewhere -

18  Q.   And -

19  A.   - around there.

20  Q.   - just for clarification, CorrLinks is the email system

21  where Inmates communicate with Attorneys, loved one, whoever -

22  A.   Yes.

23  Q.   - else is on that, correct?

24  A.   Yes.

25  Q.   So, would you write Mr. McMahon letters -

Baukman - Direct Examination

1   A.   Yes.

2   Q.   - in terms of what you were thinking or what you wanted

3   done?

4   A.   I wrote Mr. McMahon numerous times.

5   Q.   Okay.  When you say "numerous", how many times?

6   A.   At least probably about 30 times.

7   Q.   Okay.  Do you ever recall getting a written response back

8   from Mr. McMahon?

9   A.   No, he would never respond.  I would -

10  Q.   Okay.

11  A.   - have Tiffany hunt him down, because she worked over at -

12  Q.   All right.  Now, let's go back a little bit.  Tiffany is

13  who?

14  A.   That's my son's mom.

15  Q.   Okay.

16  A.   I would have -- she worked over at the Criminal Justice

17  Center.  So I would have her hunt him down and relay a message.

18  Tell Jack to come see me, or did he get my letter, and things

19  in this nature, because she would come up every week to see me

20  before she'd go to work.

21  Q.   So to the best of your recollection, you never got

22  correspondence back answering your letters?

23  A.   No, he would -

24  Q.   Well -

25  A.   - just tell her that he received a letter.  And he'll be

1    up.   Usually he'll say I'll be up next week.

2    Q.   Would you -

3    A.   And -

4    Q.   - have phone calls with him through the prison?

5    A.   - I called his office and I left messages a lot.  He -

6    Q.   Okay.

7    A.   - never was there.

8    Q.   So if I was to ask you how many times did you speak with

9    him over the phone, more than -

10   A.   Never.

11   Q.   - 10?  Less than 10?

12   A.   Never.

13   Q.   Never?

14   A.   No.

15   Q.   Ever; so, when there were meaningful conversations

16   occurring between you and your Counsel, Mr. McMahon, is it fair

17   to say that would have been always in-person prison visits?

18   A.   Yes.

19   Q.   And were you always down the FDC -

20   A.   Um-hmm.

21   Q.   - since the time of your Indictment?

22   A.   Yes.

23   Q.   You were never -

24   A.   Well, I was there from 2006 to 2000 -- December 2009.

25   Q.   Okay.

Baukman - Direct Examination

1   A.   And I was sent down to Warsaw in Virginia for -- until my

2   sentencing hearing.

3   Q.   Okay.  So, when -

4   A.   Actually -

5   Q.   - you were sent down to Warsaw and out of the FDC, you had

6   already been found guilty, correct?

7   A.   Yes.

8   Q.   Okay.  How many times can recall Mr. McMahon visiting you?

9   A.   I could recall three times.

10  Q.   Okay.  During the course of -

11  A.   During the whole course of him representing.

12  Q.   And that would have been, what, three, four years?

13  A.   A little over four years.

14  Q.   Okay.

15  A.   About 4 1/2.

16  Q.   Okay.  And when he would visit you, I assume, go through

17  the evidence, answer questions?

18  A.   It was more of him talking a lot more than you getting a

19  word in.  The first one was just the initial really about

20  finances and things like that, basically when I was going to

21  pay the remainder balance.

22       Then the second visit was after I threatened to fire him,

23  because we hadn't had -- haven't had any communication.  And I

24  had reached out to Thomas Burke and had Burke -- Burke had came

25  up to -

Baukman - Direct Examination

```
 1    Q.    Now, Thomas Burke is an Attorney?

 2    A.    Yes.

 3    Q.    Okay.

 4    A.    And I had him come and visit me, because I was thinking

 5    about hiring Burke as Co-Counsel.  But he said he didn't want

 6    to do it, because they're both alphas.  And they would be

 7    clashing.

 8          So then, I said I'm thinking about firing Jack.  He said

 9    he didn't want to do that, because they were friends.  And he

10    didn't want it to look like he was poaching his Clients.

11          But he did give me advice on -- because, at the time, I

12    was disgruntled with Jack about receiving discovery.  I wasn't

13    receiving anything.

14          So he told me by legal standards that the discovery is my

15    property, and the Court's only sent it to Jack because I hired

16    him.  So he can't withhold my discovery.  But -

17    Q.    So, your testimony is -- and correct me if I'm wrong --

18    the issue of the Sentencing Guidelines and what effect they may

19    have if you entered a plea of guilty, certain points you might

20    be eligible to have reduced, certain departure issues that may

21    be available, depending upon a whole myriad of conditions.

22    Your testimony is that that conversation never occurred -

23    A.    No, it hadn't.

24    Q.    - between you and your Counsel, Jack McMahon, correct?

25    A.    That's correct.
```

Baukman - Direct Examination

```
 1   Q.    Okay.

 2   A.    Never happened.

 3   Q.    Now, had you written him about looking to seek some sort

 4   of a Plea Agreement?

 5   A.    Yeah, early on, because when I first came in the FDC, they

 6   placed me in the SHU.  I was in the SHU for almost -

 7   Q.    All right.  Now, when you say "SHU" -- and I know the

 8   Court's well-aware of it.  But just for the record, SHU is -

 9   A.    That's the hold.

10   Q.    Okay.

11   A.    I was in the hold for almost a whole year.  So, guys up

12   there were getting called over for Proffer hands and they

13   weren't -- they wasn't aware of it beforehand.  So they was

14   upset with their Lawyers.

15         So I wrote Jack letting him know, don't agree to any

16   Proffer hands, because I don't have any plans on cooperating.

17   And because once this case is done and over with, I don't want

18   any strings attached with the streets or the Government.  So, I

19   want to get back to making movies.  So don't schedule any

20   Proffer hands for me.

21         And at the time, I heard that Ace Coles was offered

22   20 years.  So I told him that and to see what he could do for

23   -- the best he could do for me.

24   Q.    So you made it clear.  Correct me if I'm wrong.  You made

25   it clear that you had no interest in cooperating?
```

Baukman - Direct Examination

```
1   A.   Yeah.

2   Q.   But did you also make it clear in a letter or a series -

3   A.   Yes.

4   Q.   - of letters -

5   A.   It was -

6   Q.   - to him?

7   A.   - all in -

8   Q.   Let me finish.

9   A.   - there.  Oh.

10  Q.   Let me finish; that you wanted to explore the possibility

11  of pleading guilty but without cooperation?

12  A.   Yes.

13  Q.   Okay.  Did you ever get a response back to that specific

14  question at all?

15  A.   No.

16  Q.   Now, this Menace video, you were -- my understanding --

17  the sort of architect of this.  You wrote it?

18  A.   Yeah, I -

19  Q.   Produced it?

20  A.   - wrote.

21  Q.   The whole bit?

22  A.   Directed it, produced.  I sought the distribution deal.

23  Q.   Okay.  And this video contained props for the purpose of

24  making it, correct?

25  A.   Yeah, it was a urban street film in Philadelphia done with
```

1  a couple kids that grew up with each other.  And one was a

2  obvious menace, because he was a sociopath.

3      So -- but then, there was another one that was likable.

4  But, the whole premise of the movie was he actually was the

5  menace, because everybody that was surrounded by him, he seemed

6  like the nice guy, but they were the ones that was affected and

7  even down to his girlfriend getting killed.

8  Q.  Okay.

9  A.  That was the whole -

10 Q.  But -

11 A.  - premise -

12 Q.  - specifically -

13 A.  - of the movie.

14 Q.  - with regard to the movie, there were items?

15 A.  Yeah, the money counter.

16 Q.  That -- just hold on -- that, when you would look at the

17 movie, would have appeared to be drug-related items -

18 A.  Yes.

19 Q.  - correct?

20 A.  Yes.

21 Q.  Were they, in fact, drug-related items in the movie?

22 A.  Yes.

23 Q.  Okay.  Like, for instance, were they actual drugs?

24 A.  No.

25 Q.  Okay.

Baukman - Direct Examination                          Page 48

```
 1  A.   No.

 2  Q.   So, there was a money counter -

 3  A.   Yes.

 4  Q.   - that the Government had, I think, introduced and used?

 5  A.   Yes.

 6  Q.   Was that a real money counter?

 7  A.   Yeah, I bought it from Sam's Club a week before we started

 8  shooting.

 9  Q.   Okay.  So that money counter was used as a prop.  Is that

10  correct?

11  A.   Yes.

12  Q.   The drugs, or what appeared to be drugs in the video, what

13  was that?

14  A.   Tone Soap.

15  Q.   Tone Soap?

16  A.   Yeah.

17  Q.   Okay.  And the guns, now, were they, in fact, real guns?

18  A.   Yeah, I had hired a Gunsmith.  He was out of New Jersey.

19  And basically I got him out of -- I got him out of the

20  Directory from the Philadelphia Film Commission.  And I had

21  hired the Philadelphia Police to be on set with the guns at the

22  time, because they had to check the guns before we used them in

23  the -

24  Q.   So -

25  A.   - movie.
```

Baukman - Direct Examination

```
 1    Q.   - you had actually paid the Philadelphia Police Department
 2    to have some sort of a supervisory role -
 3    A.   Yes, they had to be -
 4    Q.   - in terms of -
 5    A.   - on set.
 6    Q.   - your ability to make these shoots?  Is that -
 7    A.   Yes.
 8    Q.   - correct?
 9    A.   They had to be on set.
10    Q.   Okay.  So these guns, they were real guns?
11    A.   Yes.
12    Q.   But they were guns -
13    A.   It was -
14    Q.   - owned by -
15    A.   They shot once.
16    Q.   - this Gunsmith?
17    A.   Yes.
18    Q.   Okay.  Now, did you communicate to Mr. McMahon that these
19    items were, in fact, props used in this movie?
20    A.   Yes, he knew.
21    Q.   Oh, okay.  When Alton Coles had testified and an issue
22    came up with this Menace video, did you have communications
23    with Mr. McMahon about wanting that video to be played, based
24    upon the fact that you knew, or you understood, that these
25    items were props and not real drugs, so to speak?
```

1    A.   Well, before trial, the whole plan from everybody's

2    Attorney was the tapes were going to be played.  And I was

3    going to testify, because I knew the ins-and-outs of the movie.

4         And Morris was going to testify about the stairways and

5    things in this nature.  Coles was never going to testify.

6    During trial, him and Chris Warren threw a monkey wrench and

7    put him on there, so then me and Morris just backed off.

8    Q.   Okay.  But you heard me ask Mr. McMahon about an

9    individual by the name of Chris Schwartz -

10   A.   Yes.

11   Q.   - correct?  Who was Chris Schwartz?

12   A.   Chris Schwartz owns RuffNation.  That's the same

13   Chris Schwartz that brung [phonetic] out Lauryn Hill, the

14   Fugees.  He had numerous movies with Nelly, with Snipes, I

15   think it was called, something like that.

16   Q.   Okay.  Now, these are Musical Performers?

17   A.   Yes.

18   Q.   Because I'm assuming they're not on Judge Surrick's

19   playlist, so just wanted -

20   A.   I -

21   Q.   - to make sure.  But these are known in the industry -

22   A.   Yes.

23   Q.   - Musical Performers?

24   A.   Yes, yes.

25   Q.   Oh, okay.  And Chris Schwartz, was he a Co-Producer of

Baukman - Direct Examination

1  these movie -- of this movie with you?

2  A.   He was.  He locked in my distribution deal through his

3  deal with Sony.  I was basically piggybacking his deal with

4  Sony that he had that had worldwide distribution on.

5  Q.   So, if this film conceivably was going to be introduced at

6  trial -

7  A.   Um-hmm.

8  Q.   - Chris Schwartz could have testified as a Co-Producer of

9  the film?

10  A.   Yes.

11  Q.   Okay.  And he was essentially your partner in the making

12  of this movie.  Am I correct?

13  A.   I had full timing.  But they gave me some funding.

14  Q.   Okay.  And was it your belief, separate and apart from

15  whatever the thoughts were -- and we've heard Mr. McMahon

16  explain his thoughts.

17       But whatever the thoughts were after Mr. Cole testified --

18  Mr. Coles testified, was it your belief that the video, itself,

19  would help to explain or exonerate some of your activity,

20  because -

21  A.   We thought it was -

22  Q.   - they were props and not real items?

23  A.   Yeah, because other things was used.  Like they had maps

24  of locations and things like that that they had obtained during

25  the Search Warrant that was part of the scene selections.

1        But they used it as tools of the trade, as opposed to what

2    they actually were.  And if you would have played the movie,

3    you would have seen these items in the set.

4    Q.    Okay.  Let me just go back.  Just step back just briefly;

5    at any point in time, did Mr. McMahon ever present to you in

6    writing what the Guidelines might be?  Did he ever present to

7    you in writing an analysis of if you went to trial and you were

8    found guilty of everything, what you might be looking at?

9    A.    No.

10   Q.    Or if you pled guilty, got certain points off, perhaps

11   your ability to seek certain type departures, depending upon a

12   whole range of situations, was that ever presented to you -

13   A.    No, because -

14   Q.    - in writing in any fashion?

15   A.    No, because early on, I thought that the -- because it was

16   a rumor that -- I ran into somebody that I knew, that I grew up

17   with.  And I asked them.

18        I said, how was the deals over here?  And he told me that

19   the guys that were pleading guilty was cooperating.  So I had

20   the assumption that the only way that you could plead guilty in

21   the Federal System is by cooperating.

22   Q.    And -

23   A.    And Jack -- had the conversation with Jack, didn't clear

24   that up, because soon as we got in and started talking, the

25   only thing he told me was that this case reminds him of the

Baukman - Direct Examination

```
 1   Joey Malina case that he helped represent.  I forgot his Client
 2   name that he had on that case.
 3       But the same thing, the Government said that they had all
 4   this evidence of him.  But once he started looking in it, they
 5   barely mentioned his Client.
 6       His Client got the least amount of time to -- for me to
 7   trust him.  He knows what he's doing.  He's been doing this for
 8   years.  And jurors will convict you of a lesser offense just to
 9   say that they did their job as a juror.
10   Q.  Now, Mr. Baukman, tell me if I'm wrong here.  But was this
11   your first contact with the Criminal Justice System?
12   A.  The Federal System, yes.
13   Q.  Okay.  So you didn't have any preconceived notions about
14   Guidelines or anything like that.  Am I correct?
15   A.  Never heard of them before -
16   Q.  Okay.
17   A.  - until I was experiencing them.
18   Q.  And just to be clear, you wrote to Mr. McMahon asking him
19   to explore possible guilty plea options, just as long as
20   nothing involved actual formal cooperation.  Am I correct?
21   A.  Yes, that was my initial letter.
22   Q.  Right; so you hadn't -- and tell me if I'm wrong -- you
23   hadn't precluded any type of desire to plead guilty.  You just
24   wanted to make sure it was known that you were not cooperating?
25   A.  Yeah.
```

1   Q.    Okay.

2           MR. GRIFFIN:   I have no further questions, sir.

3                          CROSS EXAMINATION

4           BY MR. WEBER:

5   Q.    Good afternoon, Mr. Baukman.

6   A.    How are you doing?

7   Q.    You were arrested in 2006 -

8   A.    Yes.

9   Q.    - correct?  Fair to say that you knew you were facing a

10  lot of time in prison from the outset?

11  A.    Well, not being incarcerated, 10 years is a life sentence

12  to somebody that never did a jail in jail.

13  Q.    Right; and then you were detained pending trial, right?

14  A.    Yes.

15  Q.    And at your detention hearing, the maximum sentence was

16  read into the record, wasn't it?

17  A.    I believe they said something about 40 years or something

18  like that, because it had Tiffany worried.  And she was upset.

19  And Jack, when he came up about that time about when he saw my

20  finances, he said, no, no, no, they can't do that.

21      But what they did was they added things up together.

22  Don't worry about that; you're not looking at that.

23  Q.    Okay.  But the 40 years, you knew, was the maximum, right?

24  A.    Well, he told me -

25  Q.    And -

```
 1   A.   He told me that -

 2   Q.   But -

 3   A.   - they added it up.  So -

 4   Q.   Hold -

 5   A.   - he's -

 6   Q.   My -

 7   A.   He told me my -

 8   Q.   Sir -

 9   A.   - maximum was -

10   Q.   - sir -

11   A.   - 20 years.

12   Q.   - my question -

13   A.   Okay.

14   Q.   - was, after that hearing, you understood from that

15   hearing the maximum to be 40 years?

16   A.   Actually -

17   Q.   Yes or no?

18   A.   - during that hearing -- actually, during that hearing, I

19   didn't catch it.

20   Q.   Your girlfriend caught it?

21   A.   Yeah.

22   Q.   And she said it was 40 years -

23   A.   And she -

24   Q.   - correct?

25   A.   - came -- when she came up with -
```

Baukman - Cross Examination

```
 1   Q.   Sir -

 2   A.   - the -

 3   Q.   - that was a yes or no question.

 4   A.   What's the question?

 5   Q.   The question was:  your girlfriend told you the maximum

 6   was 40 years?

 7   A.   Yeah.

 8   Q.   As you just -

 9   A.   She said -- she didn't say the maximum or minimum, or

10   anything like that.  That's not how normal -

11   Q.   Okay.

12   A.   - people talk.  She just said that they mentioned

13   40 years.

14   Q.   Fair enough.

15   A.   That's -

16   Q.   Now, you testified that you spoke with another Attorney,

17   Thomas Burke, about potentially retaining him -

18   A.   Um-hmm.

19   Q.   - correct?

20   A.   Yes.

21   Q.   You never did that, did you?

22   A.   No, I didn't.  He only -

23   Q.   You -

24   A.   - came that -

25   Q.   Hang on.
```

Baukman - Cross Examination

1    A.    - one time.

2    Q.    It -- you never fired Mr. McMahon, did you?

3    A.    No, he came up and cleared it up.

4    Q.    You proceeded to trial with Mr. McMahon representing you -

5    A.    Yes.

6    Q.    - right?  All right.  Now, you testified about sending

7    some letters to Mr. McMahon?

8    A.    Yes.

9    Q.    Do you have any copies of those letters?

10   A.    I believe so.  Yes.

11   Q.    Did you present them to the Court today?

12   A.    I don't have them here.

13   Q.    Okay.  The film, Menace, what does Menace stand for?

14   A.    It was a lot of different angles with Menace.  Like I

15   said, the whole -- the written -- because Menace, like I said,

16   the first guy is a sociopath and he's killing anybody that

17   slighted him -

18   Q.    Um-hmm.

19   A.    - to the -- so initially, if you watch it, you'll see.

20   Everybody would say he's the menace.  But, actually, it's the

21   other guy that is likable that's actually a menace, because

22   he's the nucleus to all these things that's happened, all these

23   crimes that's happened.  He's the nucleus.

24        And then, me and Ace was the Producer.  So if you pull it

25   apart, Menace is spelled Me N Ace.

1    Q.    I understand.

2    A.    And these is just things that just -

3    Q.    I -

4    A.    - had different layers on things.

5    Q.    - understand.  So part of it is -

6    A.    It was just as a -

7    Q.    - the theme of the film.  But then the other part was it's

8    me is you, correct?

9    A.    Yes.

10   Q.    And Ace is Alton Coles?

11   A.    Yeah, it was just a -

12   Q.    What role did Alton Coles have in making that film?

13   A.    Nothing.

14   Q.    So why?  Nothing, why would he be -

15   A.    Because he was -

16   Q.    - the Ace in Menace?

17   A.    - just my partner on the record label.

18   Q.    Okay.

19   A.    That was it.

20   Q.    The record label is the -

21   A.    Taking Them Records.

22   Q.    Hang on.  The record label is what in relation to Menace?

23   A.    That's the entertainment business that we were doing

24   together.  That's where the Me N Ace came from.

25   Q.    Okay, I understand.  You received a sentence of

Baukman - Cross Examination

```
 1   360 months' incarceration -

 2   A.   Thirty years.

 3   Q.   - correct?

 4   A.   Yes.

 5   Q.   In this proceeding here, you're hoping to get a new trial,

 6   right?

 7   A.   Yes.

 8   Q.   Or you're hoping at least to get a new sentencing, is that

 9   right?

10   A.   Yes.

11   Q.   And hopefully a lower sentence, if there's a new

12   sentencing, right?

13   A.   Everybody would.

14   Q.   Okay.

15   A.   Who would want to spend another day in jail?

16   Q.   Thank you.

17          MR. WEBER:   Your Honor, that's all I have.

18          THE COURT:   All right.  Anything further, Counsel?

19          MR. GRIFFIN:   No, sir.

20          THE COURT:   You may step down.

21      (The Witness is excused.)

22          MR. GRIFFIN:   Your Honor, I have nothing further to

23   present, on behalf of Mr. Baukman.

24                DEFENDANT BAUKMAN RESTS

25          MR. WEBER:   I don't have any other evidence, either,
```

```
1    Your Honor.

2             THE COURT:   All right.

3             MR. WEBER:   I have argument on the Motion.  But in

4    terms of witnesses or documents, nothing further.

5             THE COURT:   You don't want to recall Mr. McMahon?

6             MR. WEBER:   No, I believe he already testified

7    about -

8             THE COURT:   All right.

9             MR. WEBER:   He testified about the events and so did

10   Mr. Baukman.

11            THE COURT:   All right.  I'll hear whatever you have

12   to say.

13            MR. WEBER:   Okay.  Would you like me to approach,

14   Your Honor?

15            THE COURT:   Certainly.

16                 CLOSING ARGUMENT FOR THE GOVERNMENT

17            MR. WEBER:   All right.  So, as Your Honor pointed

18   out at the beginning of the hearing, there are two separate

19   issues on which the Court granted this evidentiary hearing.

20            The first is whether Mr. McMahon discussed with

21   Mr. Baukman the Sentencing Guidelines and specifically if he

22   wanted to plead guilty before trial, would he -- what effect

23   would that have on the offense level?

24            Mr. McMahon testified here today he's been doing this

25   for 33 years.  This trial took place 15 years ago.  So, at that
```

1  point, he'd been doing it for at least 18 years.

2            And he testified about his standard practice, which

3  was to tell his Clients what sentencing exposure they're

4  looking at, if they plead guilty, if they go to trial, or if

5  they cooperate.

6            Mr. McMahon testified that he did that in this case.

7  He testified that Mr. Baukman always wanted a trial.  And so, I

8  think the record on that is pretty clear, from Mr. McMahon's

9  perspective.

10            Mr. Baukman testified also, gave obviously a

11  different account.  But I believe this is sort of a credibility

12  determination for Your Honor.

13            And Mr. Baukman received a significant sentence.

14  He's obviously trying to either get out from under that

15  sentence completely and/or at least to get a new sentencing.

16  So that's obviously undercutting, I think, any testimony on

17  this point.

18            So, for those reasons, Your Honor -- oh, and one

19  other things, which is that this was argued in the Government's

20  Brief.  When you look at the sentencing hearing transcript, the

21  record very much supports that Mr. Baukman never had any

22  intention of pleading guilty in this case.

23            A lot of the times, Defendants who are convicted at

24  trial use the sentencing hearing to express remorse for their

25  crimes.  Mr. Baukman didn't do that.

```
 1            He, as was pointed out in the Government's Brief,

 2   talked a lot about the gripes about the case and what the

 3   Government did, and how he was unfairly treated.  So I think

 4   that lack of remorse reflects that this was someone who he

 5   wanted to go to trial.  He understood the risks.  But he made

 6   the choice to go to trial and he got convicted.

 7            Also on the first issue, Your Honor, I would note

 8   that I think the record is clear that there was no

 9   ineffectiveness.  Mr. McMahon discharged his duties.

10            But even if you go to the prejudice factor, I'm not

11   sure how Mr. Baukman would be able to prevail.  He received a

12   sentence of 360 months' incarceration.

13            The PSR had a Offense Level 44, Criminal History 1.

14   And that resulted in a range of life-plus-60 months for a

15   § 924(c) charge.

16            Even if he pled guilty and got the three-level

17   reduction, his Guidelines would have been Offense Level 41,

18   Criminal History Category Number 1.  The range would be 320 --

19   324 months to 404 months, plus 60 months for the § 924(c).

20            So the minimum would have been 384 months.

21   Mr. Baukman received a sentence lower than his Guidelines, had

22   he pled guilty and gotten the benefit of the 3 points.  So I

23   think that's relevant to the prejudice factor.

24            As for the second issue, which was:  was Mr. McMahon

25   ineffective for not introducing the Menace film into evidence?
```

1    The caselaw is pretty clear, Your Honor, that, to be

2    constitutionally ineffective, it's a pretty low bar.

3           Here, Mr. McMahon made a strategic decision not to

4    introduce the video.  There were good reasons for that

5    strategic decision.

6           He testified here today about his theory of the case,

7    which was essentially to chip away at the most serious counts

8    in the Indictment.  And the way to do that is to claim that

9    Mr. Baukman -- or the Government didn't have sufficient

10   evidence that Mr. Baukman and Mr. Coles were engaged in a

11   conspiracy, and that Mr. Baukman was the righthand man.

12          That was a plausible theory, based on the evidence.

13   The jury obviously didn't agree.  But it was a plausible one.

14   And the reason I say that, Your Honor, is because you presided

15   over the trial.

16          A lot of the evidence that came in against

17   Mr. Baukman was actually drugs found at his apartment.  So, if

18   the theory is trying to get the best possible resolution for

19   your Client at trial, it's, of course, get rid of the most

20   serious of counts.  And if there's a possession with intent to

21   distribute count, maybe you're looking at a much lesser

22   sentencing exposure if you get convicted of that.

23          So that's all to say that Mr. McMahon's theory of the

24   defense was a good one.  It was certainly not constitutionally

25   ineffective.  I don't think there's really any way you can say

1      that.

2           And Mr. McMahon also talked about the everything was

3      fake/prop defense.  He didn't think it was a good one.  And he

4      explained why.  It was not credible.

5           Mr. McMahon has done numerous, numerous trials.

6      Your Honor has presided over maybe as many as Mr. McMahon has

7      done.

8           Jury credibility is huge.  Mr. McMahon made the

9      decision that it was the best course of action to distance his

10     Client from Mr. Coles and argue that the evidence that they

11     were linked in a criminal conspiracy was not sufficient.

12          Mr. McMahon explained to the Court why he thought

13     Defendant Alton Coles' testimony was ridiculous and why, if he

14     parroted that to the jury sitting right there, that his better

15     defense would have lost credibility.

16          So I think the record is pretty clear that

17     Mr. McMahon did a very good job at trial.  He chose a defense

18     that tried to get his Client the best possible result.

19          And the Menace tape would not have helped him achieve

20     that aim.  I think Mr. McMahon testified that it -- if

21     Mr. Coles testified more, it would have hurt his Client.  So

22     that's on whether Mr. McMahon provided constitutionally

23     effective assistance of Counsel on the second issue.

24          And then, the other point I would like to raise is on

25     the prejudice aspect of that second issue.  And I'm just going

 1    to grab something from my table, Your Honor.  So just in your

 2    indulgence.

 3            I'm holding here, Your Honor, the trial transcript of

 4    Alton Coles.  And these yellow tabs here are all instances of

 5    where Mr. Coles is testifying in great detail about the Menace

 6    tape and what's in it, and why everything is props, and why the

 7    drugs are soap, and why it wasn't real drugs.

 8            So, my point, Your Honor, is the jury heard the

 9    everything was fake, New Jack City, Menace video defense.  They

10    rejected it.  They convicted Mr. Baukman and Mr. Coles.

11            Your Honor sustained a post-trial challenge to the

12    sufficiency of the evidence.  And the Third Circuit affirmed

13    that Decision.

14            I don't have the citation of the Third Circuit case.

15    But it's from 2014, I believe.  Appellate review of the

16    sufficiency of the evidence, the Third Circuit upheld that

17    Decision.

18            So, just sort of in summary on that point, any --

19    introducing the Menace video would, at most, have been

20    cumulative, because the jury heard all about it.  And they did

21    not find the defense to be valid, because they convicted the

22    Defendants.

23            And I think that sort of supports Mr. McMahon's

24    argument that he thought the everything was a prop video --

25    everything was a prop defense was not a good one and would have

1    cost him credibility before the jury.

2         And the last point I will make, Your Honor, is that,

3    assuming -- just assume the Menace video came in and it showed

4    that the drugs and money counter were props.  The jury still

5    had significant amounts of evidence from other sources:  Search

6    Warrants in August of 2005 at two locations where they seized

7    actual drugs, actual guns, actual packaging materials, actual

8    compression devices.

9         What difference would it have made if they were props

10   in the Menace videos?  The Agents had actual drugs and guns on

11   the table.

12        There were recorded conversations, which were clearly

13   about drug trafficking.  There was extensive and very damning

14   witness testimony from Christina Lanty [phonetic].

15        She testified that Mr. Baukman was Coles' righthand

16   man.  And she saw him and -- sorry, Mr. Coles and Mr. Baukman

17   exchange money and cocaine.  Again, completely unrelated to the

18   Menace video.

19        A Co-Defendant testified, again, about Mr. Baukman's

20   role in this conspiracy.  And there were also some other lay

21   witnesses who testified about the money laundering aspects of

22   the case that the Defendant was convicted on.  An IRS Agent

23   testified on that, as well.

24        So my point here, Your Honor, is that there was

25   significant evidence of Mr. Baukman's guilt on all the counts

 1   that the jury convicted him on.  It would have made no

 2   difference whatsoever if the Menace video had been admitted

 3   into evidence, because Mr. Coles testified about it.

 4          And even if they had seen it, that issue, that

 5   Defense was before the jury.  And they rejected it.

 6   Your Honor found the evidence sufficient and the Third Circuit

 7   agreed.

 8          So, for those reasons, Your Honor, I think the

 9   § 225 [sic] Petition should be denied with respect to these

10   remaining two issues.  Thank you.

11          THE COURT:  All right.

12           CLOSING ARGUMENT FOR THE DEFENDANT BAUKMAN

13          MR. GRIFFIN:  Judge, if I may -- and I say this with

14   all due respect to Mr. Weber -- I don't understand the bulk of

15   those arguments.  We are here on two relatively narrow issues

16   that this Court has granted an evidentiary hearing on.  We're

17   not here on a standard involving sufficiency of the evidence or

18   anything like that.

19          On the second issue having to do with the Menace

20   video, of course we're dealing with Mr. McMahon's trial

21   experience.  I've known Jack McMahon for many years.

22          I've tried cases with him.  I consider him a very

23   dear friend.  He's probably one of the more experienced

24   Attorneys in the area.  That's quite obvious.

25          But that may be relevant in terms of the Menace

1    issue.  And this Court is well-aware that it could make a

2    Finding that perhaps that it wasn't the right strategic move.

3    Maybe something else should have been done, but perhaps there

4    may be harmless error in that the Court feels that there was

5    other areas of overwhelming evidence.

6             But, Judge, I think, in response to your question,

7    when we had concluded, does Mr. McMahon possibly need to be

8    called back?  And I think the answer was no.

9             Issue number 1 has nothing to do with prejudice.  It

10    is presumptively prejudice if this Court were to find that

11    Mr. McMahon did not go over the Guidelines, did not properly

12    advise him of that, and did not explore, at the request of the

13    Defendant who made those requests to him in writing, to explore

14    guilty plea options, not cooperation.  That was very clear.

15             But that's a fundamental constitutional error.  That

16    has nothing to do with:  did it prejudice the Defendant?  Of

17    course, it prejudiced the Defendant.

18             That's a clear indication that that one does not

19    involve an and/or.  The Court can't most respectfully waffle on

20    that one, so to speak.

21             Now, with regard to the Menace issue, I think the

22    testimony was clear, whether the Court accepts it or not, that

23    maybe this evidence would have been most helpful.  But, with

24    all due respect -- and I don't mean to use this word in an

25    incorrect fashion -- but the Court has a number of outs in that

1    respect.

2           Mr. McMahon is very experienced.  He evaluated this

3    situation, made a gametime decision, and determined, based upon

4    his years of experience, I don't think we should go there.

5           And the Court is aware that the evidence was

6    overwhelming to some respects on some Defendants, perhaps

7    lighter on others.  But we live in a system where we need to

8    respect that verdict.

9           The suggestion that Mr. Baukman should be not looked

10   upon favorably because he'd like to get a new trial, he'd like

11   to get his sentence reduced, well, of course he would.  But

12   there's another professional way to look at this.

13          He's pursuing rights that our Federal Rules allow,

14   such as a § 2255 Petition.  And this Court found it sufficient

15   enough to grant an evidentiary hearing on two issues.

16          And the critical issue, of course -- again, has

17   nothing to do with prejudice -- is the first issue, because

18   that is a -- I would argue -- that is a fatal issue to the

19   Commonwealth if this Court were to find that Mr. McMahon was

20   ineffective in not properly going through the Guidelines, in

21   not properly, at the request of the Defendant, seeking various

22   non-trial options.

23          That's a fatal blow to the Government in this case,

24   because you can't go back from there if someone wasn't aware or

25   was not counseled by his Attorney as to what his rights were

1    proceeding forward.  That's fatal.  That's not harmless error.

2    That's not anything of the sort.  So that, I think, is the

3    issue most prominent that's got to be focused in on.

4            Now, we were living back then in a pre-CorrLinks

5    society.  And Your Honor, I'm sure, is well-familiar with

6    CorrLinks.

7            It's the email system that allows for frequent

8    communication.  I have a Client right now.  I think I get 15,

9    20 emails a week through the CorrLinks system.

10           So there was phone contact.  You've heard testimony.

11   Now, I guess the Court is free to believe that whatever

12   Mr. Baukman testified is completely untrue and I find that he

13   has no credibility whatsoever.  I'm sure the Court is certainly

14   free to do that.

15           But testified that he wrote numerous letters, perhaps

16   30 of which, in terms of letters.  Some of them, in particular,

17   focused in on this request to see, like, what is available to

18   me.

19           He did that based upon the fact that one of his

20   Co-Defendants was offered a C Plea for 10 years.  That plea, I

21   understand, fell apart for other reasons.  But an offer was

22   made.

23           There were no phone conversations that occurred.

24   Numerous attempts to call, but none.  So, the reality that

25   seems to be unchallenged is the fact that in a period of four

1  years, from pre-arrest leading all the way up to the finality

2  of his representation, there were maybe three visits.

3         So, presumably, somewhere in one of those visits, I

4  guess, was this going through everything.  It wasn't

5  memorialized.

6         I don't think it has to be.  I don't know.  I think

7  if you don't do it, I don't think you're a bad Lawyer.  I'm not

8  suggesting that.

9         But, a lot of this almost seems to be uncontroverted.

10  And on that issue there, I suggest to this Court that's a fatal

11  issue, because if someone isn't apprised of what their

12  constitutional rights are, about the ability to plead guilty,

13  the ability to have points knocked off, the ability to pursue

14  certain departure issues, maybe.

15         If that standard is not met, that supersedes

16  everything going forward.  That's not subject to any type of a,

17  well, he wasn't prejudiced by the fact that he didn't know his

18  rights.  That's a presumptively prejudicial situation, if that

19  is, in fact, what this Court mind find.

20         And it's always dangerous reading tea leaves.  But I

21  think the Court seemed to think maybe it was a little concerned

22  about why Mr. McMahon may not have been called back to counter

23  some of these arguments.

24         Now, I'm not a poker player.  So maybe I'm dead wrong

25  on that.  But it seemed to be an issue.  And I think, with all

 1    due respect, it is, in fact, a fatal issue to the Government in

 2    this particular matter.

 3              THE COURT:   All right.

 4              MR. GRIFFIN:   Thank you, sir.

 5                    REBUTTAL ARGUMENT FOR THE GOVERNMENT

 6              MR. WEBER:   Just very, very briefly, Your Honor.  I

 7    can do it from here.  Mr. McMahon testified that he met with

 8    Mr. Baukman, discussed the case.  That's all on his direct

 9    examination.

10              So I certainly don't agree that the record is

11    uncontroverted on the level of communication between them.  I

12    think it's pretty clear what happened, from Mr. McMahon's

13    direct testimony.  Thank you.

14              THE COURT:   All right.  Counsel, I will review the

15    matter.  I will hand down an appropriate Decision.  I'm going

16    to frankly get the transcript of what occurred here today, so

17    that I can look at it again more closely.

18              But, you will get a Decision in this matter shortly.

19    All right?  With that, we will be -

20              MR. GRIFFIN:   Sir, can I just briefly address with

21    you one other matter?  I let Mr. Weber know it's completely a

22    separate matter.

23              Mr. Baukman had brought to my attention that, in his

24    PSI, there is still a mention.  And it's prominent enough that

25    it has caused him issues, in terms of location, status in terms

```
 1   of where his level is in the prison.

 2           He was convicted of two § 924(c) counts.  There was

 3   one that Your Honor sustained a Rule 29 Motion on.  Mr. Weber's

 4   going to forward that document to me.  I'm going to review it.

 5   If the Court will allow, I may be back to you with an idea

 6   toward correcting that PSI to properly reflect what the record

 7   reflected?

 8           THE COURT:   You may certainly do that.

 9           MR. GRIFFIN:   Thank you, sir.

10           THE COURT:   All right.

11           MR. WEBER:   Thank you.

12           MR. GRIFFIN:   May I be excused?

13           THE COURT:   Yes, indeed.

14           MR. GRIFFIN:   Thank you.

15           MR. WEBER:   Thank you, Your Honor.

16           THE COURT:   We will recess.

17       (Proceedings concluded at 4:10 p.m.)

18

19

20

21

22

23

24

25
```

**C E R T I F I C A T I O N**

I, <u>VICTORIA O'CONNOR</u>, court-approved transcriber,

certify that the foregoing is a correct transcript from the

official electronic sound recording of the proceedings in the

above-entitled matter.


_____          _____January 27, 2023_____

     Victoria O'Connor, CET                         Date